1   GARTH T. VINCENT (SBN 146574)
    Garth.Vincent@mto.com
2   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue
3   Thirty-Fifth Floor
    Los Angeles, CA  90071-1560
4   Telephone:    (213) 683-9100
    Facsimile:    (213) 687-3702
5
    AMY C. TOVAR (SBN 230370)
6   Amy.Tovar@mto.com
    MUNGER, TOLLES & OLSON LLP
7   560 Mission Street
    Twenty-Seventh Floor
8   San Francisco, CA  94105-2907
    Telephone:    (415) 512-4000
9   Facsimile:    (415) 512-4077

10  Attorneys for Defendants
    KAM HING ENTERPRISES, INC.; SUNHAM HOME
11  FASHIONS, LLC; HOWARD YUNG; AND ARTHUR
    COURBANOU
12
                    UNITED STATES DISTRICT COURT
13
                  NORTHERN DISTRICT OF CALIFORNIA
14
                        SAN FRANCISCO DIVISION
15

16
    E&E CO., LTD. A California corporation,          CASE NO.  3:08-CV-00871-MMC
17
                        Plaintiff,                   DEFENDANTS' NOTICE OF MOTION AND
18                                                   MOTION TO DISMISS FIRST AMENDED
               vs.                                   COMPLAINT PURSUANT TO FED. R. CIV.
19                                                   PROC. 12(B)(6) AND 12(B)(2);
    KAM HING ENTERPRISES, INC.;                      MEMORANDUM OF POINTS OF
20  SUNHAM HOME FASHIONS, LLC;                       AUTHORITIES IN SUPPORT THEREOF
    JJ INTERNATIONAL TRADING
21  COMPANY; HOWARD YUNG,                            [Request for Judicial Notice and Proposed
    ARTHUR COURBANOU; and DOES 1-                    Order filed concurrently herewith]
22  100, inclusive,
                                                     Judge:      Maxine M. Chesney
23                      Defendants.                  Date:       August 1, 2008
                                                     Time:       9:00 a.m.
24                                                   Ctrm:       7, 19th Floor

25

26

27

28

5225340.1

1

## NOTICE OF MOTION AND MOTION

2

TO PLAINTIFF AND ITS COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE THAT, on July 25, 2008 at 9:00 a.m., ("Defendants")

4

will and hereby do move the Court for:

5

[1]     An Order dismissing with prejudice Plaintiff's First Cause of Action – for

6

"Per Se Conspiracy Violation of the Cartwright Act," California Business & Professions Code

7

§§ 16720 *et seq.* – pursuant to Federal Rule of Civil Procedure 12(b)(6), on the ground that the

8

cause of action fails to state a claim upon which the Court may grant Plaintiff relief;

9

[2]     An Order dismissing with prejudice Plaintiff's Second Cause of Action –

10

for "Restraint of Trade-Cartwright Act" under California Business & Professions Code §§ 16720

11

*et seq.* – pursuant to Federal Rule of Civil Procedure 12(b)(6), on the ground that the cause of

12

action fails to state a claim upon which the Court may grant Plaintiff relief;

13

[3]     An Order dismissing with prejudice Plaintiff's Third Cause of Action – for

14

"Unfair Competition" under California Business & Professions Code §§ 17200 *et seq.* – pursuant

15

to Federal Rule of Civil Procedure 12(b)(6), on the ground that the cause of action fails to state a

16

claim upon which the Court may grant Plaintiff relief;

17

[4]     An Order dismissing with prejudice Plaintiff's First, Second, and Third

18

Causes of Action as to Defendants Howard Yung and Arthur Courbanou pursuant to Federal Rule

19

of Civil Procedure 12(b)(2), on the ground that this Court lacks personal jurisdiction over them.

20

This Motion is based upon this Notice of Motion and Motion; the Memorandum of

21

Points and Authorities; Request for Judicial Notice, and Proposed Order that are being filed

22

concurrently with this Motion; the Declarations of Howard Yung and Arthur Courbanou that were

23

filed concurrently with Defendants' first Motion to Dismiss; the Supplemental Declarations of

24

Howard Yung and Arthur Courbanou that were filed concurrently with Defendants' Reply in

25

Support of the first Motion to Dismiss, all pleadings and documents on file in this action; and

26

such other materials that the Court may properly consider prior to deciding this Motion.

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................1

II.  BACKGROUND ................................................................................................2

    A.  Factual Background ................................................................................2

    B.  Procedural Background ..........................................................................5

III.  ARGUMENT .....................................................................................................6

    A.  Plaintiff Fails To Plead A Per Se Antitrust Violation.............................7

    B.  Plaintiff Still Fails To State A Claim Under The Rule Of Reason ........10

    C.  Plaintiff Fails To Plead An Actionable UCL Claim .............................16

    D.  Defendants Yung and Courbanou Are Not Subject To Personal Jurisdiction In California.........................................................................21

IV.  CONCLUSION.................................................................................................23

1

# TABLE OF AUTHORITIES

2

**Page**

3

## FEDERAL CASES

4

*Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.,*
    141 F.3d 947 (9th Cir. 1998) ................................................................................10

*Assam Drug Co. v. Miller Brewing Co.,*
    798 F.2d 311 (8th Cir. 1986) ...........................................................................14, 15

*Associated Gen. Contractors of Cal., Inc. v. Carpenters,*
    459 U.S. 519 (1983) .............................................................................................7

*Barry Wright Corp. v. ITT Grinnell Corp.,*
    724 F.2d 227 (1st Cir. 1983) ................................................................................11

*Bell Atlantic Corp. v. Twombly,*
    127 S. Ct. 1955 (2007) ..................................................................................6, 8, 9

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) ...........................................................................................22

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.,*
    485 U.S. 717 (1988) .............................................................................................7

*Calder v. Jones,*
    465 U.S. 783 (1984) ...........................................................................................23

*Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.,*
    996 F.2d 537 (2d Cir. 1993) ................................................................................15

*Cappa v. CrossTest, Inc.,*
    -- Cal.App.4th --, 2008 WL 821637 (1st Dist. Mar. 28, 2008)...........................18

*Car Carriers, Inc. v. Ford Motor Co.,*
    745 F.2d 1101 (7th Cir. 1984) ..............................................................................8

*Colt Studio, Inc. v. Badpuppy Enter.,*
    75 F. Supp. 2d 1104 (C.D. Cal. 1999) ................................................................23

*Continental T.V., Inc. v. GTE Sylvania, Inc.,*
    433 U.S. 36 (1977) ...............................................................................................7

*Davis v. Metro Prods., Inc.,*
    885 F.2d 515 (9th Cir. 1989) ..............................................................................23

*DM Research, Inc. v. Coll. of Am. Pathologists,*
    170 F.3d 53 (1st Cir. 1999) ...................................................................................8

*Dole Food Co., Inc. v. Watts,*
    303 F.3d 1104 (9th Cir. 2002) ............................................................................23

*Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.,*
    357 F.3d 1 (1st Cir. 2004) ...................................................................................11

*Federal Trade Comm'n v. Indiana Fed'n of Dentists,*
    476 U.S. 447 (1986) ...........................................................................................10

*Floors-N-More, Inc. v. Liquidators,*
    142 F. Supp. 2d 496 .............................................................................................9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES
### (continued)

Page

*Flynt Distrib. Co., Inc. v. Harvey,*
734 F.2d 1389 (9th Cir. 1984) ...................................................................................21

*G&C Auto Body, Inc. v. Geico Gen. Ins. Co.,*
No. C 06-04898 MJJ, 2007 WL 4350907 (N.D. Cal. Dec. 12, 2007) ..................17, 18

*General Leaseways, Inc. v. National Trucking Leasing Ass'n,*
744 F.2d 588 (7th Cir. 1984) ...................................................................................15

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,*
284 F.3d 1114 (9th Cir. 2002) .................................................................................21

*Heart Disease Research Found. v. General Motors Corp.,*
463 F.2d 98 (2d Cir. 1972) .........................................................................................8

*Helicoptores Nacionales de Colombia, S.A. v. Hall,*
466 U.S. 408 (1984) .....................................................................................11, 15, 22

*International Norcent Technology v. Koninklijke Philips Electronics, N.V.,*
2007 WL 4976364 (C.D. Cal. Oct. 29, 2007) ...........................................................8, 9

*Int'l Shoe Co. v. Washington,*
326 U.S. 310 (1945) ..................................................................................................22

*Iqbal v. Hasty,*
490 F.3d 143 (2d Cir. 2007) ........................................................................................6

*JM Computer Servs., Inc. v. Schlumberger Tech., Inc.,*
No. C 95-20349 JW, 1996 WL 241607 (N.D. Cal. May 3, 1996).............................16

*Kellam Energy, Inc. v. Duncan,*
668 F. Supp. 861 (D. Del. 1987)...............................................................................16

*Kendall v. Visa U.S.A., Inc.,*
518 F.3d 1042 (9th Cir. 2008) ....................................................................................8

*Late Fee and Over-Limit Fee Litig.,*
528 F. Supp. 2d 953 (N.D. Cal. 2007).......................................................................19

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,*
127 S. Ct. 2705 (2007)...............................................................................................11

*Mack v. South Bay Beer Distributors, Inc.,*
798 F.2d 1279 (9th Cir. 1986) ....................................................................................3

*Missing Link, Inc. v. Ebay, Inc.,*
2008 WL 1994886 (N.D. Cal. May 5, 2008)............................................................18

*Newcal Indus. Inc. v. Ikon Office Solution,*
513 F.3d 1038 (9th Cir. 2008) .............................................................................11, 13

*Northern Pacific Ry. Co. v. United States,*
356 U.S. 1 (1958).........................................................................................................7

*O.S.C. Corp. v. Apple Computer,*
601 F. Supp. 1274 (C.D. Cal. 1985), *aff'd* 792 F.2d 1464 (9th Cir. 1986)..............15

*Omega Envtl., Inc. v. Gilbarco, Inc.,*
127 F.3d 1157 (9th Cir. 1997) ........................................................................10, 11, 15

*Pebble Beach Co. v. Caddy,*

MOTION TO DISMISS FAC
3:08-CV-00871-MMC

**TABLE OF AUTHORITIES**
(continued)

**Page**

453 F.3d 1151 (9th Cir. 2006) ........................................................................23

*Rebel Oil Co. v. Atlantic Richfield Co.,*
51 F.3d 1421 (9th Cir. 1995) .......................................................................12

*Retina Associates v. Southern Baptist Hosp.,*
105 F.3d 1376 (11th Cir. 1997) .............................................................14, 15

*Sybersound Records, Inc. v. UAV Corp.,*
517 F.2d 1137 (9th Cir. 2008) .....................................................................21

*Tanaka v. Univ. of S. Cal.,*
252 F.3d 1059 (9th Cir. 2001) ...................................................1, 11, 12, 13

*Toys "R" Us, Inc. v. F.T.C.,*
221 F.3d 928 (7th Cir. 2000) ....................................................................7, 9

*Tuazon v. R.J. Reynolds Tobacco Co.,*
433 F.3d 1163 (9th Cir. 2006) .....................................................................22

*United States v. E.I. du Pont de Nemours & Co.,*
351 U.S. 377 (1956) ....................................................................................13

*Walker v. USAA Cas. Ins. Co.,*
474 F. Supp. 2d 1168 (E.D. Cal. 2007) .......................................................17

*Western Parcel Express v. United Parcel Service of America, Inc.,*
190 F.3d 974 (9th Cir. 1999) .......................................................................16

*Ziegler v. Indian River County,*
64 F.3d 470 (9th Cir. 1995) .........................................................................21

**STATE CASES**

*Buckland v. Threshold Enters. Ltd.,*
155 Cal. App. 4th 798 (2007) ......................................................................17

*Californians For Disability Rights v. Mervyn's, LLC,*
39 Cal. 4th 223 (2006) .................................................................................18

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone, Co.,*
20 Cal. 4th 163 (1999) .................................................................................20

*Chavez v. Whirlpool Corp.,*
93 Cal.App.4th 363 (2001) ..........................................................................19

*Chicago Title Ins. Co. v. Great W. Fin. Corp.,*
69 Cal. 2d 305 (1968) ...................................................................................8

*Cortez v. Purolator Air Filtration Prods. Co.,*
23 Cal. 4th 163 (2000) .................................................................................17

*Daro v. Superior Court,*
151 Cal.App.4th 1079 (2007) ......................................................................18

*Eddins v. Redstone,*
134 Cal.App.4th 290 (2005) ..........................................................................9

*Exxon Corp. v. Superior Court,*
51 Cal.App.4th 1672 (1997) ..............................................................11, 14, 15

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Hall v. Time, Inc.*,
  158 Cal.App.4th 847 (2008) ...............................................................17, 18

4

*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*,
  129 Cal.App.4th 1228 (2005) ...................................................................18

5

6

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ...........................................................................17

7

*O'Brien v. Camisasca Automotive Mfg., Inc.*,
  161 Cal. App. 4th 388 (2008) ...............................................................2, 18

8

*People's Choice Wireless, Inc. v. Verizon Wireless*,
  131 Cal.App.4th 656 (2005) .....................................................................20

9

10

*Redwood Theatres, Inc. v. Festival Enters., Inc.*,
  200 Cal. App. 3d 687 (1988) ...............................................................11, 15

11

*Rolley, Inc. v. Merle Norman Cosmetics, Inc.*,
  129 Cal.App.2d 844 (1954) .......................................................................15

12

*Roth v. Rhodes*,
  25 Cal.App.4th 530 (1994) ...................................................................11, 15

13

STATE STATUTES

14

Cal. Bus. & Prof. Code § 17204 .............................................................17

TREATISES

15

Schwarzer, Tashima, Wagstaffe, Cal. Prac. Guide Fed. Civ. Proc. Before Trial Ch.
  9-D (Rutter Group 2007) .............................................................................3

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS FAC
3:08-CV-00871-MMC

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    INTRODUCTION**

3            Continuing its retaliatory strike against parties that have sued it in another forum,[1]

4  Plaintiff E&E Co., Ltd., an importer and distributor of textiles, has filed a first amended

5  complaint, again alleging that its competitor violated California's Cartwright Act and Unfair

6  Competition Law ("UCL") in connection with certain overseas business activities.  This Court, in

7  dismissing Plaintiff's prior complaint, held that Plaintiff failed to state a claim under either

8  statute.  Plaintiff attempts to cure the deficiencies of its original complaint by piling on

9  conclusory assertions and legal rhetoric instead of the required factual allegations.  Having been

10 given a chance to re-plead, Plaintiff has confirmed that it has no actionable claim against

11 Defendants.  Plaintiff's first amended complaint ("FAC") therefore should be dismissed with

12 prejudice.  *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1065 (9th Cir. 2001) (antitrust

13 complaint appropriately dismissed with prejudice where complaint cannot be saved by further

14 amendment).

15            In its first cause of action—premised on a group boycott theory—Plaintiff tries to

16 make up for its previous failure to allege a horizontal agreement by inserting conclusory

17 allegations that such an agreement exists.  In particular, Plaintiff alleges that the Sunham

18 Defendants[2] orchestrated an agreement among unidentified Chinese textile suppliers "to boycott

19 and cease supplying products to Plaintiff." (FAC ¶ 29).  But Plaintiff cannot simply mouth the

20 word "boycott" to state a plausible claim that a horizontal agreement exists among the Chinese

21 suppliers, much less that one was facilitated by the Sunham Defendants.  Federal pleading

22 standards demand that plaintiffs provide factual support for their allegations, and here Plaintiff

23 ─────────────
[1] Prior to filing this lawsuit, Plaintiff was sued by defendants Kam Hing Enterprises, Inc. ("Kam
24 Hing") and Sunham Home Fashions, LLC ("Sunham") in two separate actions that are pending in
   the Southern District of New York.  *See* Notice of Pendency of Other Action or Proceeding
   Pursuant to Local Rule 3-13, filed April 22, 2008, docket no. 16.
25
[2] The FAC defines the Sunham Defendants as the combination of Kam Hing and Sunham.
26 Throughout the FAC, Sunham and Kam Hing are effectively treated as a single entity.  Sunham
   and Kam Hing are in fact distinct entities with separate business operations.  On a motion to
27 dismiss, however, Defendants must assume E&E's allegations to be true.  Therefore, for the
   purpose of this motion, Defendants will adopt the same term Plaintiff uses to refer to Kam Hing
28 and Sunham combined.

MOTION TO DISMISS FAC
3:08-CV-00871-MMC

1    offers none.

2          Plaintiff's second cause of action is based on the same purported vertical exclusive

3    dealing arrangements between the Sunham Defendants and the unidentified Chinese suppliers that

4    the Court previously found failed to state a claim because Plaintiff had not plead that the Sunham

5    Defendants have market power within any appropriately defined relevant market.  Order at 2.

6    Plaintiff now attempts to recast the relevant market as "the distribution channel through which

7    top-of-the-bed linens, such as quilts, duvets, coverlets, and other such bed coverings that are

8    manufactured in China, are imported/distributed into the United States."  (*Id.* ¶ 2.)  This market

9    definition is legally untenable for a number of reasons, including its imposition of artificial

10    geographic boundaries.  Moreover, even in a properly defined relevant market, Plaintiff still fails

11    to allege plausibly that the Sunham Defendants have market power.

12          Plaintiff lacks standing to assert its third cause of action brought under the UCL.

13    In 2004, the voters in California modified the UCL's standing requirements to prevent individuals

14    who did not have a concrete injury stemming from the challenged business practice from bringing

15    claims under that law.  Since that time, courts have found that to have standing under the UCL a

16    "plaintiff must have [1] spent money, [2] lost money or property, or [3] been denied money to

17    which he or she was entitled, due to unfair business practices."  *O'Brien v. Camisasca Automotive*

18    *Mfg., Inc.*, 161 Cal. App. 4th 388, 399 (2008).  The only injury Plaintiff claims here is a loss of

19    sales and business opportunities, a hypothetical and conjectural injury that manifestly fails to

20    satisfy the UCL's standing requirements.

21          Lastly, while all three of Plaintiff's claims fail on their merits as to all Defendants,

22    the FAC is also subject to dismissal under Federal Rule of Civil Procedure 12(b)(2) as to Howard

23    Yung and Arthur Courbanou, officers of Sunham whom the Plaintiff has named as defendants.

24    Neither individual has sufficient minimum contacts with California and the Court thus lacks a

25    proper basis for asserting personal jurisdiction over them.

26    **II.**    **BACKGROUND**

27        **A.**    **Factual Background**

28          The home textile market is a multi-billion dollar per year industry.  Last year,

nearly $3 billion worth of cotton bedspreads, sheets, and pillowcases were imported into the United States alone.[3]  China is the single largest exporter of home textiles to the United States, exporting over $1 billion worth of cotton bedspreads, sheets, and pillowcases into the United States in 2007. *Id.*

Plaintiff and the Sunham Defendants are competitors in this global home textiles market. (FAC ¶ 22).  They  purchase home textiles abroad and sell them to major retailers in the United States. (*Id.* ¶¶ 16, 17).  The Sunham Defendants occupy a tiny fraction of the massive home textiles market:  Each year, the Sunham Defendants sell several or tens of millions dollars of textile goods that are ultimately sold in California stores such as Mervyns, Bed Bath & Beyond, Macy's, Kohl's, and Linens-n-Things. (*Id.* ¶ 17).  It is alleged that California is the Sunham Defendants' largest and most lucrative marketplace. (*Id.* ¶ 18).

The conduct challenged in the FAC involves the Sunham Defendants' alleged "efforts to orchestrate a group boycott" of Plaintiff by "some manufacturers" in China,"(*id.* ¶¶ 22-23), and extract from them "exclusive dealing arrangements," (*Id.* ¶ 35).  Despite this exclusive dealing jargon, the FAC explicitly alleges that the suppliers "are permitted" to continue selling "other" products to the Sunham Defendants' competitors. (*Id.* ¶ 35).  The FAC does not provide any information about the number of manufacturers involved in these supposed agreements, their names, or the volume of their sales.

In an effort to put some meat on the bones of its pleading, Plaintiff contends to have unearthed an unsigned letter supposedly from the "Sunham Home Fashions Shanghai Rep. Office" to "Respected Suppliers/Factories" indicating that "[e]xclusive cooperation is the precondition to partnership." (FAC Ex. A).[4]  Although Plaintiff discusses this purported letter

---

[3] *See* 2007 Major Shippers Report, United States Department of Commerce, Office of Textiles & Apparel, *available at* http://otexa.ita.doc.gov/msr/catV362.htm; http://otexa.ita.doc.gov/msr/catV360.htm; http://otexa.ita.doc.gov/msr/catV361.htm.  The cited data is subject to judicial notice.  Schwarzer, Tashima, Wagstaffe, Cal. Prac. Guide Fed. Civ. Proc. Before Trial Ch. 9-D at 9:219 (Rutter Group 2007) (reports of an administrative body are subject to judicial notice) (citing *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986)).  *See* Request for Judicial Notice In Support Of Defendants' Motion To Dismiss Amended Complaint ("RJN") Exs. A-C filed concurrently herewith.

[4] Plaintiff attaches a copy of the purported original letter written in Chinese to the FAC.  The copy is of such poor quality that it is completely illegible.  Plaintiff was apparently able to

under the heading "Per Se Conspiracy," it says nothing whatsoever about a horizontal agreement among suppliers. Instead, it reflects a unilateral communication from a customer to an unnamed group of suppliers describing terms by which it conducts business. A recipient of the letter, if there were any, could not have known from its face anyone else to whom it was sent.

The FAC also repeats Plaintiff's allegation that Defendants participate in a purported tax evasion scheme that gives the Sunham Defendants an inappropriate advantage in the marketplace. (FAC ¶¶ 46-47). According to the FAC, J.J. International – an alleged company controlled by Defendant Howard Yung – serves as the Sunham Defendants' "exclusive overseas agent." (*Id.* ¶ 46). Plaintiff alleges that the Sunham Defendants pay a 15% markup on all purchases of products from J.J. International for distribution in the United States. (*Id.*) This, Plaintiff contends, allows the Sunham Defendants to "falsely increase their cost of goods and lower their reported profits by approximately 15%." (*Id.*) As a result, Plaintiff concludes, the Sunham Defendants avoid paying taxes that would otherwise be due to the Internal Revenue Service. *Id.*

As a result of this conduct, Plaintiff asserts that it and other unnamed bedding distributors have "lost and will continue to lose sales and prospective business opportunities." (*Id.* ¶ 49). But E&E does not allege that it or any other textile distributor has been foreclosed from purchasing bedding or other home textiles from China or any other country. To the contrary, Plaintiff admits that it continues to purchase such textiles in China and sell them to retailers in the United States. (*Id.* ¶ 16). Moreover, Plaintiff does not allege that consumer choice has been reduced, output has decreased, or the price of textiles has increased as a result of the alleged misconduct.

---

provide a more legible copy of the letter to a paid translator as an English translation of the letter is also attached to the FAC. Despite the questionable circumstances surrounding the letter, Defendants accept Plaintiff's allegations about the letter as true for the purposes of this motion. Nevertheless, Defendants reserve all rights to challenge the authenticity of the letter at the appropriate stage of litigation.

**B.    Procedural Background**

1.    **The Original Complaint**

On December 12, 2007, Plaintiff filed the instant action in Alameda County Superior Court. Among the defendants named in the original complaint—and now the amended complaint—are the defendants who bring this Motion: (1) Kam Hing; (2) Sunham; (3) Howard Yung, Owner of Kam Hing and Chief Executive Officer of Sunham; and (4) Arthur Courbanou, Chief Financial Officer and Chief Operating Officer of Sunham (collectively "Defendants").[5] (Compl. ¶¶ 2-6; FAC ¶¶ 8-10, 12-13; *see also* Howard Yung Decl. ¶ 2; Arthur Courbanou Decl. ¶ 2.)[6] Both complaints also name as a defendant J.J. International Trading Company ("J.J. International"), a purported Hong Kong-based entity which, to Defendants' knowledge, has not yet been served. (Compl. ¶ 5; FAC ¶ 11). The original complaint stated two causes of action – a Cartwright Act claim as to the Sunham Defendants and a UCL claim as to all Defendants – both of which were entirely predicated on the alleged conduct described above occurring overseas.

2.    **The Court's Order Granting Defendants' Motion To Dismiss**

Defendants moved to dismiss the complaint and strike Plaintiff's claim for restitution under the UCL. On April 29, 2008, the Court entered an Order dismissing both of Plaintiff's claims. First, with respect to Plaintiff's antitrust claim, the Court rejected Plaintiff's argument that it had alleged a group boycott or any other *per se* antitrust violation on the basis that Plaintiff failed to allege a horizontal agreement among direct competitors. (Order at 1-2). Plaintiff alleged only an agreement between the Sunham Defendants, an alleged distributor, and "some manufacturers in China." (*Id.* at 2). As the Court observed, "such agreements constitute vertical rather than horizontal restraints." (*Id.*) The Court further held that Plaintiff failed to state a claim under the "rule of reason" because Plaintiff "fail[ed] to identify the relevant market" and allege that the Sunham Defendants have "market power within such market." (*Id.*)

---

[5] Defendants removed the case to federal court on the basis of diversity jurisdiction.

[6] The Declarations of Howard Yung and Arthur Courbanou were submitted in support of their initial motion to dismiss for lack of personal jurisdiction. Messrs. Yung and Courbanou now reassert their motion brought under Rule 12(b)(2) and rely upon the previously filed declarations. *See* Docket Nos. 8, 9, 15-2, 15-3.

1         Next, the Court dismissed Plaintiff's UCL claims, holding that Plaintiff's

2    allegations were "insufficient to satisfy the unlawful prong" because it failed to identify a

3    particular statute that Defendants had violated. (*Id.* at 2-3). The Court further held that Plaintiff's

4    allegations were "insufficient to satisfy the unfair prong" because Plaintiff had failed to allege a

5    violation of the Cartwright Act. (*Id.* at 3). The Court granted Defendants' motion to strike

6    Plaintiff's claim for restitution under the UCL, observing that Plaintiff did not dispute its failure

7    to plead sufficient facts to support its prayer for such relief. (*Id.*)

8         Lastly, because the Court dismissed the entire complaint for failure to state a

9    claim, it did not need to reach Defendants' alternative argument that the claims against Messrs.

10   Yung and Courbanou were subject to dismissal for lack of personal jurisdiction. (*Id.*) The Court

11   expressly noted that Defendants could re-file their Rule 12(b)(2) motion in the event that the

12   individual defendants were named in an amended complaint. (*Id.*)

13        The crux of the FAC has been copied from the prior version of the complaint. The

14   additional paragraphs that Plaintiff has tacked on—which are chockfull of repetitive, conclusory

15   allegations—do nothing to cure the deficiencies in Plaintiff's prior pleading.

16   **III.    ARGUMENT**

17        A complaint must be dismissed under Rule 12(b)(6) if it fails to plead "enough

18   facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S.

19   Ct. 1955, 1974 (2007). In particular, the *Twombly* Court admonished that "a plaintiff's obligation

20   to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a

21   formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (citations

22   omitted). The *Twombly* decision "obliges a pleader to amplify a claim with some factual

23   allegations in those contexts where such amplification is needed to render the claim *plausible*."

24   *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). The *Twombly* court emphasized the

25   particular importance of requiring factual support for allegations in the antitrust context where

26   proceeding to discovery can be prolonged and expensive: "a district court must retain the power

27   to insist upon some specificity in pleading before allowing a potentially massive factual

28   controversy to proceed." 127 S. Ct. at 1967 (citing *Associated Gen. Contractors of Cal., Inc. v.*

1    *Carpenters*, 459 U.S. 519, 528 n.17 (1983)).

2    **A.    Plaintiff Fails To Plead A *Per Se* Antitrust Violation**

3            The rule of reason is the accepted standard for testing whether a practice restrains

4    trade, *see Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 (1977), unless the

5    challenged action falls into the category of "agreements or practices which because of their effect

6    on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable

7    and therefore illegal . . . ." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958).

8    Resort to the *per se* rule—which eliminates the need to study the reasonableness of an individual

9    restraint in light of the real market forces at work—is confined to restraints "that would always or

10   almost always tend to restrict competition and decrease output." *Bus. Elecs. Corp. v. Sharp*

11   *Elecs. Corp.*, 485 U.S. 717, 723 (1988).

12           Plaintiff tries to claw its way into stating a *per se* claim by attempting to allege a

13   hub-and-spoke conspiracy, which involves a ringleader that is a dominant purchaser or supplier in

14   the relevant market (the hub) who enters into a series of agreements with its suppliers (the

15   spokes).  The series of agreements may become actionable where there is a connecting agreement

16   among the horizontal competitors that form the spokes. *See Toys "R" Us, Inc. v. F.T.C.*, 221

17   F.3d 928 (7th Cir. 2000).  Although certain hub-and-spoke conspiracies may be listed among the

18   classes of economic activity that merit *per se* invalidation, Plaintiff has manifestly failed to plead

19   activity falling within this forbidden category.

20       **1.    Plaintiff's Conclusory Allegation Of An Agreement Among The**
             **Unidentified Chinese Suppliers Is Insufficient To State A Claim**
21

22           Plaintiff attempts to salvage its group boycott theory by tacking onto its complaint

     a few pat statements about a horizontal agreement.  In particular, Plaintiff nakedly asserts that the
23
     manufactures "conspired . . . amongst each other" and "banded together to boycott and cease
24
     supply[ing] products to Plaintiff." (FAC ¶¶ 27, 29). But Plaintiff offers no factual support for
25
     these newly-concocted allegations, such as the identify of the alleged conspirators, when and how
26
     the conspiracy was formed, or the terms of the agreement.  In short, Plaintiff fails to "answer the
27
     basic questions:  who, did what, to whom (or with whom), where, and when?" *Kendall v. Visa*
28

1   *U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (dismissing conclusory allegations that

2   defendants entered into a conspiracy because there was no factual support).[7]

3           Courts have made clear that "a mere allegation that parties entered into an

4   agreement to restrain trade does not suffice to state [an antitrust] claim." *International Norcent*

5   *Technology v. Koninklijke Philips Electronics, N.V.*, 2007 WL 4976364, at *10 (C.D. Cal. Oct.

6   29, 2007). An antitrust plaintiff cannot survive a motion to dismiss simply by trumpeting

7   antitrust buzzwords like "agreement," "conspiracy," and "boycott." *See, e.g., Kendall*, 518 F.3d at

8   1047 ("Terms like 'conspiracy,' or even 'agreement,' are border-line: they might well be

9   sufficient in conjunction with a more specific allegation—for example, identifying a written

10  agreement or even a basis for inferring a tacit agreement.") (citing *DM Research, Inc. v. Coll. of*

11  *Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999)); *Car Carriers, Inc. v. Ford Motor Co.*, 745

12  F.2d 1101, 1110 (7th Cir. 1984) ("invocation of antitrust terms of art does not confer immunity

13  from a motion to dismiss; to the contrary, these conclusory statements must be accompanied by

14  supporting factual allegations."); *Heart Disease Research Found. v. General Motors Corp.*, 463

15  F.2d 98, 100 (2d Cir. 1972) ("[A] bare bones statement of a conspiracy or of injury under the

16  antitrust laws without any supporting facts permits dismissal.").

17          The Supreme Court observed in *Twombly* that a complaint must allege facts such

18  as a "specific time, place, or person involved in the alleged conspirac[y]" to satisfy Rule 8

19  pleading requirements. 127 S. Ct. at 1970 n.10. In that case, the Supreme Court found

20  allegations that the defendant telephone companies "entered into a contract, combination or

21  conspiracy to prevent competitive entry in their respective local and/or high speed internet

22  services markets and have agreed not to compete with one another and otherwise allocated

23  customers and markets to one another," insufficient because the plaintiff pleaded no factual

24  support that could prove such a conspiracy. *Id.* at 1963. The Court held that the complaint's

25

26  ────────────────

    [7] "Since the Cartwright Act and the federal Sherman Act share similar language and objectives,
    California courts often look to federal precedents under the Sherman Act for guidance." *Chavez*

27  *v. Whirlpool Corp.*, 93 Cal.App.4th 363, 369-70 (2001); *see also Redwood Theaters, Inc. v.*
    *Festival Enters., Inc.*, 200 Cal.App.3d 687, 694 (1988); *Chicago Title Ins. Co. v. Great W. Fin.*

28  *Corp.*, 69 Cal. 2d 305, 315 (1968).

1  "few stray statements" that spoke of a direct agreement were "merely legal conclusions" that fell

2  short of stating a plausible claim of a conspiracy. *Id.* at 1970.[8]  Likewise, in *Floors-N-More, Inc.*

3  *v. Liquidators*, 142 F. Supp. 2d 496 (S.D.N.Y. 2001), the plaintiffs—like Plaintiff here—offered

4  no more than an "utterly conclusory" allegation of a horizontal agreement and failed to "provide a

5  single fact in support of this allegation." *Id.* at 501 (plaintiff alleged that "defendants, acting in

6  concert, agreed to stop supplying household goods to Floors-N-More."). Rejecting the plaintiff's

7  barebones allegation, the court observed that an antitrust plaintiff "must do more than allege the

8  existence of a conspiracy—it must allege some facts in support of the claim." *Id.*

9        Here, Plaintiff not only fails to allege a sufficiently plausible factual basis for its

10  allegation of an agreement among the unidentified Chinese suppliers, it alleges *no* factual basis

11  for its claim. Apparently, Plaintiff erroneously believes that by uttering magic words like

12  "conspired" and "boycott" it has sufficiently plead an agreement to violate the antitrust laws. But

13  as the case law demonstrates, courts routinely reject such attempts to allege an agreement with no

14  more *ipse dixit* allegations of a boycott.

15        Plaintiff also fails to provide any factual support for its allegation that the Sunham

16  Defendants "orchestrated" the alleged boycott by the suppliers. There is nothing in the purported

17  letter or elsewhere in the FAC that supports this conclusory allegation. Indeed, there are no

18  allegations that the Sunham Defendants met with the unidentified suppliers, offered them

19  assurances that their competitors were willing to cut-off business with Plaintiff, or otherwise

20  facilitated communication among them. *Compare Toys "R" Us*, 221 F.3d at 932 (defendant

21  orchestrated a horizontal conspiracy among its key suppliers where the suppliers joined the

22  boycott "on the condition that their competitors would do the same") (citations omitted); *see also*

23  *Eddins v. Redstone*, 134 Cal.App.4th 290, 313 (2005) (No *Toys-"R"-Us*-type conspiracy where

---

24  [8] *Twombly* further held that specific factual allegations of parallel conduct by the defendants
25  combined with an allegation of conspiracy were insufficient to state an antitrust claim. 127 S. Ct.
   at 1966 ("Without more, parallel conduct does not suggest a conspiracy, and a conclusory
26  allegation of agreement at some unidentified point does not supply facts adequate to show
   illegality."). Courts since *Twombly* have explicitly recognized that "[i]f a conclusory allegation
27  of an agreement is not sufficient even when supported by facts demonstrating parallel conduct,
   such an allegation cannot be sufficient . . . where no parallel conduct or ay other factual context is
28  alleged." *International Norcent Tech.*, 2007 WL 4976364, at *10.

plaintiff could not show that video retailer Blockbuster communicated any message from movie

studio to studio, that any studio feared acting alone or wanted assurance about other studios'

conduct, or that Blockbuster "enforced" any agreement by the studios).  Thus, Plaintiff not only

fails to plead that a horizontal agreement exists among the unidentified Chinese suppliers, its fails

to plead that the Sunham Defendants arranged such an agreement.

2.     **Plaintiff Has Not Stated A *Per Se* Antitrust Violation Because It Has Not Alleged That The Sunham Defendants Possess Market Power**

Even if Plaintiff's conclusory statements about a conspiracy among the

unidentified Chinese suppliers were sufficient to state a horizontal agreement—which they are

not—Plaintiff would still fail to state a *per se* violation of antitrust law.  In the context of alleged

group boycotts, "the per se approach has generally been limited to cases in which firms with

*market power* boycott suppliers or customers in order to discourage them from doing business

with a competitor."  *Federal Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458

(1986) (emphasis added); *see also Adaptive Power Solutions, LLC v. Hughes Missile Systems

Co.*, 141 F.3d 947, 950 (9th Cir. 1998) (the characteristics of "a per se illegal boycott" include

"the boycotting firm possesses a dominant market position").  Plaintiff makes the throw-away

allegation that the Sunham Defendants have "market power in the United States and China," FAC

¶ 38, yet fails to provide any factual support for its claim.  In fact, as demonstrated below,

Plaintiff's own allegations establish as a matter of law that the Sunham Defendants lack market

power in any appropriately defined relevant market.  Therefore, even if Plaintiff had properly

plead a horizontal agreement, it would still fail to state a *per se* violation of the antitrust laws.

B.     **Plaintiff Still Fails To State A Claim Under The Rule Of Reason**

Recognizing that its half-baked attempt to plead a horizontal conspiracy cannot

past muster, Plaintiff re-pleads its alternative theory that the Sunham Defendants have entered

into vertical exclusive dealing arrangements with the unidentified Chinese suppliers.  This theory

fails as well.

There are "well-recognized economic benefits to exclusive dealing arrangements."

*Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997); *see also Eastern Food*

1   *Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d. 1, 8 (1st Cir. 2004)

2   (exclusive agreements "may be highly efficient – to assure supply, price stability, outlets,

3   investment, best efforts or the like – and pose no competitive threat at all"); *Redwood Theatres,*

4   *Inc. v. Festival Enters., Inc.*, 200 Cal. App. 3d 687, 701 (1988) (vertical exclusive arrangements

5   are "not often subject to antitrust challenges"). The Supreme Court's recent decision in *Leegin*

6   *Creative Leather Products, Inc. v. PSKS, Inc.*, 127 S. Ct. 2705 (2007) is premised on the

7   economic understanding that vertical restraints, such as exclusive dealing agreements, are

8   ordinarily *procompetitive*, not anticompetitive.

9           As a result, exclusive dealing arrangements are evaluated under the rule of reason.

10  *Omega*, 127 F.3d at 1162; *Roth v. Rhodes*, 25 Cal.App.4th 530, 542 (1994); *Barry Wright Corp.*

11  *v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (contracts to purchase are judged under

12  the rule of reason because "virtually *every* contract to buy forecloses or excludes alternative

13  sellers from *some* portion of the market.") (emphasis in original). In a rule of reason case, "[t]he

14  plaintiff bears the burden of showing that the restraint produces significant anticompetitive effects

15  within a relevant market." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)

16  (citation omitted). A rule of reason analysis begins with the identification of the relevant market:

17  "Antitrust law requires allegation of both a product market and a geographic market." *Newcal*

18  *Indus. Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 n. 4. (9th Cir. 2008). A plaintiff must

19  "delineate a relevant market and show that the defendant plays enough of a role in that market to

20  impair competition significantly." *Exxon Corp. v. Superior Court*, 51 Cal.App.4th 1672, 1682

21  (1997). Indeed, exclusive agreements are only unlawful when their "probable effect is to

22  foreclose competition in a substantial share of the line of commerce affected." *Omega*, 127 F.3d

23  at 1162 (citations omitted)). As Justice O'Connor stated in her oft-cited concurrence in *Jefferson*

24  *Parish Hospital Disrict. No. 2 v. Hyde*, "[i]n determining whether an exclusive dealing contract is

25  unreasonable, the proper focus is on the structure of the market for the products or services in

26  question – the number of sellers and buyers in the market, the volume of their business, and the

27  ease with which buyers and sellers can redirect their purchases or sales to others." 466 U.S. 2, 45

28  (1984). Antitrust laws are not concerned with vertical exclusive dealing arrangements made by

1  modest players in large and competitive markets: "When the sellers of services are numerous and

2  mobile, and the number of buyers is large, exclusive dealing arrangements of narrow scope pose

3  no threat of adverse economic consequences." *Id.*

4          **1.**    **Plaintiff Fails To Allege A Properly Defined Relevant Market**

5          Plaintiff defines the market as "the distribution channel through which top-of-the-

6  bed linens, such as quilts, duvets, coverlets, and other such bed coverings that are manufactured

7  in China, are imported/distributed into the United States." (FAC ¶ 2). This market definition is

8  fatally flawed. Courts do not blindly accept implausible market definitions provided by plaintiffs

9  such as this one. *Tanaka*, 252 F.3d at 1064 (dismissing complaint that provided an

10  inappropriately narrow definition of the geographic market).

11          First, a distribution channel is not a market. "A 'market' is any grouping of sales

12  whose sellers, if unified by a monopolist or a hypothetical cartel, would have market power in

13  dealing with any group of buyers . . . Stated differently, a 'market' is the group of sellers or

14  producers who have the actual or potential ability to deprive each other of significant levels of

15  business." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (citation

16  omitted). Thus, a properly defined market is not the distribution channel through which goods are

17  sold (whatever that even means), it is the actual sales of goods by sellers to buyers.

18          Second, there is no support for the geographic limitations that Plaintiff has placed

19  on the relevant market. "The geographic market extends to the area of effective competition

20  where buyers can turn for alternative sources of supply." *Tanaka*, 252 F.3d at 1063. Plaintiff

21  offers no reason why the only purchases in the relevant market are exports to the United States.

22  Presumably, if buyers from the United States are willing to turn to China for their purchases of

23  the products at issue, buyers in Canada, Brazil, and every other country around the world that

24  engages in trade with China would be willing to turn there as well. Plaintiff presents no reason—

25  and no plausible one exists—why Chinese sellers would only be willing to sell to American

26  buyers. Simply put, there is no justification for artificially limiting the market in this way.

27          By the same token, Plaintiff offers no explanation of why the area of effective

28  competition must be limited to China. "[T]he relevant market must include the group or groups

1   of sellers or producers who have actual or potential ability to deprive each other of significant

2   levels of business." *Newcal*, 513 F.3d at 1045.  Plaintiff has not alleged and cannot plausibly

3   allege that the products at issue—top-of-the-bed linens—are only available in China and no other

4   country.  If purchasers like Plaintiff cannot obtain the products they need from suppliers in China,

5   they can readily turn to suppliers in other parts of the world.  Although Plaintiff alleges that

6   "factories in China collectively can supply the widest variety of home textiles available in the

7   world," (FAC ¶ 4), Plaintiff does not allege that buyers cannot turn to suppliers in other countries

8   for their purchases.  Nor could it:  Nearly $500 million dollars worth of cotton bedspreads and

9   quilts were imported into the United States alone last year from countries other than China.  *See*

10  (RJN Ex. A.)

11          Third, at various points in the FAC, Plaintiff suggests that the product market may

12  be more narrow than "top-of-the-bed linens" and attempts to limit that market based on cost.  *See,*

13  *e.g.*, (FAC ¶ 35) ("market for low-cost home bed covering products").  A product market must

14  include all "commodities reasonably interchangeable by consumers for the same purposes."

15  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956); *see also Tanaka*, 252

16  F.3d at 1063 ("The product market includes the pool of goods or services that enjoy reasonable

17  interchangeability of use and cross-elasticity of demand.").  In the seminal *du Pont* case, the

18  Supreme Court rejected a market consisting of only cellophane, even though cellophane had

19  unique advantages over other flexible packaging materials.  The Court instructed that rather than

20  products categories like cellophane, "it is the *use or uses* to which the commodity is put that

21  control."  351 U.S. at 396.  So the appropriate market consisted of products which could be *used*

22  for the same general purposes as cellophane, *e.g.*, all flexible packaging materials.  *See id.*  An

23  appropriate market definition will include inferior and superior products because sometimes and

24  for some uses even an inferior "cheaper product can drive out the more expensive," and

25  sometimes "the superior quality higher priced articles may" become dominant.  *Id.*  This reflects

26  the economic reality that products at different price points and quality levels compete with each

27  other.

28          The reality here is that the unnamed Chinese suppliers sell products for which

1    buyers have infinite alternatives around the world.  From the perspective of antitrust law, it does

2    not matter whether Plaintiff has been prevented from buying bedspreads of a particular design

3    and quality from certain factories in China.  What matters is whether the Sunham Defendants

4    have foreclosed competition across an entire properly defined relevant market.  The relevant

5    market here must include, *at a minimum*, top-of-the-bed linens, such as quilts, duvets, coverlets,

6    and other such bed coverings, both of superior and inferior quality and pricing, *i.e.*, products

7    "reasonably interchangeable" for the same "use."

8                              2.    **Plaintiff Fails To Allege Market Power**

9                "The need to prove market power is a threshold consideration in an antitrust case

10   and the is the sine qua non of recovery."  *Exxon*, 51 Cal.App.4th at 1681.  To establish market

11   power, "the plaintiff must show that the defendant has a dominant market share."  *Assam Drug*

12   *Co. v. Miller Brewing Co.*, 798 F.2d 311, 318 (8th Cir. 1986); *see also Exxon*, 51 Cal.App.4th at

13   1682 (market power is "usually equated with market share.").  A small market share "is

14   insufficient as a matter of law."  *Retina Associates v. Southern Baptist Hosp.*, 105 F.3d 1376,

15   1384 (11th Cir. 1997).

16               Here, the bedding market is a robust, geographically dispersed market with untold

17   participants.  As stated above, last year, nearly $3 billion worth of cotton bedspreads, sheets, and

18   pillowcases were imported into the United States alone.  (RJN Exs. A-C.)[9]  Over $1 billion worth

19   of these imports were cotton bedspreads/quilts; $500 million of which came from China.  (*Id.* Ex.

20   A.)  Of course, these figures understate the true size of the market because they do not include

21   non-cotton bedspreads/quilts, bedcoverings that were exported to countries other than the United

22   States, and products that might be used as substitutes for bedspreads/quilts.  Even based on these

23   conservative figures, it is indisputable as a matter of law that a single distributor that sells *several*

24   *or tens millions* of dollars worth of textile goods in its "largest and most lucrative marketplace,"

25   (FAC ¶¶ 17-18), could not have market power in this *billion* dollar market from which it obtains

26   ───────────────

27   [9] *See (*Exhibit A to Request for Judicial Notice, 2007 Major Shippers Report, also *available at*
     http://otexa.ita.doc.gov/msr/catV2.htm).  Of course, the figures cited about the size of the market
     are conservative because imports of textiles into the United States do not reflect all textiles

28   purchased in the global market.

1    its supplies. *See, e.g., Exxon*, 51 Cal.App.4th at 1682 (less than 10% market share insufficient);

2    *Roth*, 25 Cal.App.4th at 543 (16% insufficient); *Redwood Theaters*, 200 Cal.App.3d at 714 (3%

3    market share insufficient); *Retina*, 105 F.3d at 1384 (15% share insufficient); *Capital Imaging*

4    *Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 547 (2d Cir. 1993) ("de minimis" market

5    shares of 1-7% make "clear" insufficient "power to injure competition"); *Assam Drug Co.*, 798

6    F.2d at 318-19 (19.1% share insufficient); *O.S.C. Corp. v. Apple Computer*, 601 F. Supp. 1274,

7    1292 n.8 (C.D. Cal. 1985) (20% insufficient in competitive market), *aff'd* 792 F.2d 1464 (9th Cir.

8    1986). There is no allegation that the Sunham Defendants purchase hundreds of millions of

9    dollars worth of bedcoverings from suppliers and Plaintiff has thus failed to allege market power.

10          The facts pled in the FAC about the type of restraint (vertical exclusive dealing),

11   the relevant market (bedcoverings), and the amount of the Sunham Defendants' sales of such

12   goods (several or tens of millions) combined with judicially noticeable facts about the overall size

13   of the market (billions) compel the conclusion that Plaintiff cannot plausibly plead that the

14   Sunham Defendants have market power. Plaintiff's claim may be properly dismissed for failure

15   to allege market power alone. *See* Order at 2 (dismissing complaint for failure to allege market

16   power); *General Leaseways, Inc. v. National Trucking Leasing Ass'n*, 744 F.2d 588, 596 (7th Cir.

17   1984) (if plaintiff fails to prove market power, "the inquiry is at an end; [the] practice is lawful");

18   *Rolley, Inc. v. Merle Norman Cosmetics, Inc.*, 129 Cal.App.2d 844, 851-52 (1954) (affirming

19   demurrer where cosmetic company's exclusive deals with four retailers were too insignificant to

20   stifle competition in a competitive market); *Omega*, 127 F.3d at 1164-65 (no probable injury to

21   competition in "highly concentrated market" boasting "increasing output, decreasing prices, and

22   significantly fluctuating market shares among the major manufacturers"). Just as in *Jefferson*

23   *Parish*, "[e]ven without engaging in a detailed analysis of the size of the relevant markets we may

24   readily conclude that there is no likelihood that the exclusive dealing arrangement challenged

25   here" will substantially harm competition in the bedcoverings market. 466 U.S. at 46.

26          3.    **Plaintiff Fails To Plead The Required Elements Of An Exclusive**
              **Dealing Arrangement**
27
     Plaintiff has not actually alleged that Sunham entered into an exclusive dealing
28

1  contract with any Chinese suppliers. To assert a claim for exclusive dealing the agreements

2  challenged as "exclusive" must in fact be exclusive. *Western Parcel Express v. United Parcel*

3  *Service of America, Inc.*, 190 F.3d 974, 976 (9th Cir. 1999) (no exclusive dealing where contract

4  does not preclude dealing with competitors); *Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861,

5  883-84 (D. Del. 1987) ("[T]o constitute actionable exclusive dealing, a contract must apply to all

6  purchases that the buyer will make"). The FAC makes clear that the agreements at issue are

7  anything but exclusive. Indeed, Plaintiff admits that the unidentified Chinese suppliers continue

8  to transact business with other purchasers and/or distributors of textiles. (FAC ¶ 35). Plaintiff

9  does not allege that the manufacturers will *only* sell to the Sunham Defendants, but rather that

10 they will only sell "*certain types of products*" to Sunham's competitors. (*Id.*) (emphasis added).

11 To be an exclusive deal a party must agree to "deal *only* with" one other party. *Western Parcel*

12 *Express*, 190 F.3d at 976 (citing L. Sullivan, Law of Antitrust § 163, at 471 (1977)) (emphasis

13 added).

14         Plaintiff further fails to provide sufficient factual support for its claim that an

15 agreement exists in the first instance. Although Plaintiff has submitted a purported letter that

16 speaks of exclusivity, it has not identified a single supplier with whom the Sunham Defendants

17 allegedly entered into exclusive arrangements or the categories and volume of product the

18 arrangements covered. *See JM Computer Servs., Inc. v. Schlumberger Tech., Inc.*, No. C 95-

19 20349 JW, 1996 WL 241607, at *4 (N.D. Cal. May 3, 1996) (exclusive dealing claim too

20 conclusory where it "failed to identify an agreement with a specific person or entity and does not

21 identify the parts, services, or contracts involved in the alleged exclusive dealing."). Because

22 Plaintiff does not allege that a single supplier has agreed to sell exclusively to the Sunham

23 Defendants or identify a single supplier that entered into any such agreement with them,

24 Plaintiff's exclusive dealing claim must be dismissed.

25    **C.    Plaintiff Fails To Plead An Actionable UCL Claim**

26         **1.    Plaintiff Lacks Standing Under the UCL**

27         Plaintiff conceded in its opposition to the first motion to dismiss that it was not

28 entitled to restitution under the UCL (Opp. at 23 n.11.) and has abandoned its claim to such relief

in its FAC.  Of course, Plaintiff could not contend otherwise: It has not alleged that Defendants are in possession of property in which Plaintiff has an ownership interest.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003); *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 177 (2000).  Instead, Plaintiff merely alleges that it "suffered competitive injury in the form of lost sales and lost business opportunities."  (FAC ¶ 49.)  Despite its admission that it has not suffered any losses of money or property that are eligible for restitution, Plaintiff claims that it nonetheless has standing under Business & Professions Code § 17204 to pursue injunctive relief.  But courts have found that a plaintiff has standing under § 17204 only if it has suffered an injury for which it would be entitled to recover restitution.  *See Walker v. USAA Cas. Ins. Co.*, 474 F. Supp. 2d 1168, 1172 (E.D. Cal. 2007) (finding UCL standing requirement "should be construed identically" with requirement for showing entitlement to restitution); *Buckland v. Threshold Enters. Ltd.*, 155 Cal. App. 4th 798, 817 (2007) ("Because the remedies for individuals under the UCL are restricted to injunctive relief and restitution, the import of the requirement [that plaintiffs show 'lost money or property' under § 17204] is to limit standing to individuals who suffer losses of money or property that are eligible for restitution.").

Although one federal court has found that the restitution requirement articulated in *Korea Supply* and *Cortez* is narrower than the § 17204 standing requirement, *see G&C Auto Body, Inc. v. Geico Gen. Ins. Co.*, No. C 06-04898 MJJ, 2007 WL 4350907, at *3 (N.D. Cal. Dec. 12, 2007), no court has suggested that harm as attenuated and speculative as hypothetical lost sales can satisfy the limited standing requirements of § 17204.  *See* Cal. Bus. & Prof. Code § 17204 (limiting standing under the UCL to "[any person who] has suffered injury in fact and has lost money or property as a result of such unfair competition.").  Recently, the California court of appeal addressed the meaning of the "injury in fact" requirement, observing that "an injury in fact is 'an actual or imminent invasion of a legally protected interest, in contrast to an invasion that is conjectural or hypothetical.'"  *Hall v. Time, Inc.*, 158 Cal.App.4th 847, 853 (2008) (citing Black's Law Dict. (8th ed. 2004) p. 801).  Courts have consistently required that to have standing a "plaintiff must have [1] spent money, [2] lost money or property, or [3] been denied money to which he or she was *entitled*, due to unfair business practices."  *O'Brien v. Camisasca Automotive*

*Mfg., Inc.*, 161 Cal.App.4th 388, 399 (2008) (emphasis added) (collecting cases); *see also Hall*, 158 Cal.App.4th at 854-55 (finding plaintiff did not suffer injury in fact under any of the three definitions recognized by courts). Plaintiff's claim of lost sales and profits does not satisfy any of these categories. Courts have found standing where plaintiffs have suffered damage to property,[10] experienced unpaid accounts,[11] and lost wages,[12] but not, as is the case here, where the plaintiff has alleged hypothetical lost sales and profits to which the plaintiff cannot show it was entitled. *Cf. The Missing Link, Inc. v. Ebay, Inc.*, 2008 WL 1994886, at *8 (N.D. Cal. May 5, 2008) (plaintiff had standing where able to show more than mere "expectation of profit").

Finding that a plaintiff has standing to pursue a UCL claim despite its failure to allege anything more than a hypothetical loss would frustrate the purpose of Proposition 64, which was passed by the People of California precisely to restrict the UCL's previous broad grant of standing. *See Californians For Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 228 (2006); *Hall*, 158 Cal. App. 4th at 853. The intent of California voters in enacting Proposition 64 was to limit frivolous lawsuits by "prohibit[ing] private attorneys from filing lawsuits for unfair competition where they [had] no client who had been injured in fact." Prop. 64 § 1, subd. (e). As demonstrated above, since Proposition 64's passage, California courts have defined the "injury in fact" requirement in a manner that preserves the intent of the voters to narrow the category of persons who may sue under §17204 and denies standing to plaintiffs with attenuated and speculative claims of harm.

Plaintiff cannot compensate for its failure to demonstrate it has standing by arguing that an injunction might potentially benefit Plaintiff in some ancillary way. "[A] party who has suffered no injury as a result of a UCL violation cannot create standing by arguing that a broad-based injunction designed to remedy the UCL violation will provide him or her some incidental benefit." *Daro v. Superior Court*, 151 Cal.App.4th 1079, 1100 (2007). An injunction

---

[10] *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*, 129 Cal.App.4th 1228, 1262 (2005).

[11] *G&C Auto Body*, 2007 WL 4350907, at *3 (plaintiffs alleged they experienced unpaid accounts as a direct result of defendant insurance companies refusal to pay prevailing auto body rates).

[12] *Cappa v. CrossTest, Inc.*, -- Cal.App.4th --, 2008 WL 821637, at *7 (1st Dist. Mar. 28, 2008).

18                MOTION TO DISMISS FAC

directed towards Defendants' tax practices would not directly produce a concrete benefit for

Plaintiff, such as a guaranteed increase in sales or profits.  Because Plaintiff has suffered no

injury in fact or loss of money or property due to Defendants' alleged tax practices and an

injunction would produce no concrete benefit to Plaintiff, it lacks standing under § 17204 to

pursue injunctive relief and its UCL claim must be dismissed.

> 2. **The Court Has Already Held That Plaintiff Cannot Use The UCL To Plead Around Its Failure To Establish A Cartwright Act Violation**

Even if Plaintiff had standing, which it does not, it has not alleged a proper claim

under the UCL.  The Court granted Defendants' first motion to dismiss relating to Plaintiff's

attempt to assert a claim under the "unfair" prong of the UCL "for the reason that plaintiff has

failed to allege a violation of the Cartwright Act."  Order at 3.

Once again, Plaintiff asserts a UCL claim based on the very same conduct that

underlies its antitrust claims.  (FAC ¶¶ 44-45, 50).  As this Court recognized in its Order,

Plaintiff's UCL theory based on the alleged agreements entered into by the Sunham Defendants

and unidentified Chinese suppliers rises and falls with its Cartwright Act claim.  Indeed, Courts

have found that where a plaintiff fails to state an antitrust claim, a UCL claim predicated on the

same underlying conduct cannot survive.  *See, e.g., Chavez v. Whirlpool Corp.*, 93 Cal.App.4th

363, 375 (2001); *Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 965 (N.D. Cal. 2007)

(no cognizable UCL claim where plaintiff's theory was "explicitly premised" on an alleged

violation of antitrust laws which the court determined had not been violated).  Thus, for the same

reasons that the alleged boycott and exclusive dealing arrangements do not violate the Cartwright

Act, they are not unfair or unlawful under the UCL.[13]

Plaintiff likewise fails to establish that Defendants acted unfairly in connection

with any alleged unpaid tax obligations.  As the Court recognized in the Order, the California

Supreme Court has defined "unfair" to mean "conduct that threatens an incipient violation of an

---

[13] In addition, even if Plaintiff can show this Court has personal jurisdiction over Messrs. Yung and Courbanou, which, as discussed below, it does not, Plaintiff's theory of unfair competition premised on antitrust violations must be dismissed as to them because the FAC fails to allege any facts to support their involvement with any alleged horizontal and vertical agreements.

antitrust law, or violates the policy or spirit of one of those laws." (Order at 3) (citing *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone, Co.*, 20 Cal. 4th 163, 187 (1999)). Plaintiff does not allege that Defendants' alleged underpayment of taxes threatens an incipient violation of antitrust law. Moreover, Plaintiff cannot state a plausible claim that the alleged activity violates the policy or spirit of antitrust law or otherwise threatens or harms competition. In *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal.App.4th 656 (2005), the court of appeals affirmed a demurrer granted to defendant on a UCL claim asserted against it by competitors. Applying the rule of *Cel-Tech*, the court found that plaintiffs had failed to state a claim under the unfairness prong of the UCL because it showed neither a violation of antitrust policies nor a significant threat or harm to competition. As to the latter ground, the court remarked: "What shines through most clearly in the complaint is that [the defendant's] conduct has injured the [plaintiffs]. But, as *Cel-Tech* teaches, injury to competitors is not the same as injury to competition." *Id.* at 668.

Plaintiff does not plausibly allege that competition in the bedding market has been harmed as a result of Defendants' alleged underpayment of taxes. It does not allege that prices have risen for consumers or that consumer choice has been reduced. Plaintiff's failure to identify such harmful effects to competition is not surprising: Plaintiff cannot plausibly claim that the Sunham Defendants' alleged underpayment of taxes harmed competition in such a vast market. Indeed, for the same reasons that Plaintiff cannot demonstrate harm to competition in connection with its antitrust allegations, Plaintiff cannot demonstrate harm to competition on its "tax evasion" theory either.

Moreover, as under the Cartwright Act, even if Plaintiff could demonstrate that *it* lost sales as a direct result of the Sunham Defendants' calculation of profits for tax purposes, such an injury is insufficient to sustain a UCL cause of action premised on unfair business practices. Indeed, as the Ninth Circuit recently made clear, allegations that a defendant gained a business advantage over a competitor by reducing its costs and increasing its profits through improper means fail to state an unfairness claim unless the plaintiff can demonstrate an incipient violation of antitrust laws or harm to competition. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.2d 1137,

1152 (9th Cir. 2008).  In *Sybersound*, the Ninth Circuit affirmed the dismissal of a UCL claim

brought by karaoke record producer against competitors whom plaintiff alleged failed to properly

pay royalties and acquire licenses for their karaoke recordings and falsely told customers that

plaintiff's recordings infringed copyrights.  517 F.3d at 1153.  Although the plaintiff alleged that

it "lost money as a direct result" of these unfair business practices, the Ninth Circuit found the

plaintiff's allegations of an inappropriate advantage were not enough to plead an unfairness claim

under the UCL  because they failed to show an incipient violation of antitrust law.  *Id.*  Likewise,

here, Plaintiff's conclusory allegations that *it* suffered a competitive disadvantage *vis a vis* the

Sunham Defendants, and lost sales as a result of Defendants' tax practices, fall short of satisfying

*Cel-Tech*'s requirements.

### D. Defendants Yung and Courbanou Are Not Subject To Personal Jurisdiction In California

On a motion to dismiss pursuant to Rule 12(b)(2), the plaintiff bears the burden of

establishing that the court has jurisdiction over the defendants.  *Ziegler v. Indian River County*, 64

F.3d 470, 473 (9th Cir. 1995).  There are two steps to this inquiry:  The plaintiff must

demonstrate both that there is jurisdiction over the defendant under the forum state's long-arm

statute and that the exercise of personal jurisdiction is consistent with federal due process

requirements.  *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1392 (9th Cir. 1984).  To meet

this burden at the current stage of these proceedings, the plaintiff must make a *prima facie*

showing that jurisdiction is appropriate.  *Ziegler*, 64 F.3d at 473.  Because Plaintiff has not, and

cannot, meet this *prima facie* burden with respect to Messrs. Yung and Courbanou, they must be

dismissed for want of personal jurisdiction.

"California's long-arm [statute] permits the exercise of jurisdiction to the limits of

due process.  Thus … analysis of personal jurisdiction under California's long-arm [statute] and

the Constitution collapse into one."  *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain

Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002) (citing Cal. Civ. Proc. Code § 410.10).  Federal due

process permits a court to exercise personal jurisdiction over a non-resident defendant only if the

defendant has sufficient "minimum contacts with [the forum] such that the maintenance of the

suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). This constitutional requirement can be met either by demonstrating that the court has "general jurisdiction" or "specific jurisdiction" over the defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984). To sustain personal jurisdiction on the basis of general jurisdiction, a plaintiff must demonstrate that the defendant has maintained "continuous and systematic general business contacts" with the forum state. *Id.* at 416; *see also Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir. 2006) (for general jurisdiction to attach a defendant's contacts with the forum must approximate physical presence). To instead meet the specific jurisdiction test, a plaintiff must show that "the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotation marks omitted).

Plaintiff cannot meet either of these tests as to either Mr. Yung or Mr. Courbanou. Neither individual has conducted any business in California in recent years (Courbanou Decl. ¶ 3, Yung Decl. ¶ 3), and thus certainly has not engaged in a continuous and systematic course of business in the State such that would amount to a physical presence. Mr. Yung is the Owner of Kam Hing and Chief Executive Officer of Sunham. (Yung Decl. ¶ 2). He lives in New Jersey and works in New York. (*Id.*) Mr. Yung has not been to California for business purposes in at least five years. (*Id.* ¶ 4). He does not own property in California, advertise or market to California, or attend trade shows in California. (Yung. Supp. Decl. ¶ 2). Mr. Courbanou is the Chief Financial Officer and Chief Operating Officer of Sunham. (Courbanou Decl. ¶ 2). He lives and works in New York and has not been to California since before he started working for Sunham in 2006. (*Id.* ¶¶ 2, 4). He does not own property in California, advertise or market to California, have clients in California, or attend trade shows in California. (Courbanou Supp. Decl. ¶ 2). During the recent past, neither Mr. Courbanou nor Mr. Yung has attended meetings in California, entered into contracts with California residents, or otherwise conducted business

1    activities in California.  (Yung Decl. ¶ 4; Courbanou Decl. ¶ 4).[14]

2             Neither Mr. Yung nor Mr. Courbanou has "purposefully directed" any activities

3    at residents of the forum, let alone activities that gave rise to the purported injuries that are at

4    issue in this litigation.[15]  To the contrary, the allegations in the FAC relating to Messrs. Yung and

5    Courbanou concern purported conduct taken in their official capacities as corporate officers and

6    thus cannot be attributed to them as individual acts creating personal jurisdiction.  (FAC ¶¶ 46-

7    47) (implicating Messrs. Courbanou and Yung in a purported tax evasion scheme involving the

8    business defendants).  "For jurisdictional purposes, the acts of corporate officers and directors in

9    their official capacities are the acts of the corporation exclusively and are thus not material for

10   purposes of establishing minimum contacts as to the individuals."  *Colt Studio, Inc. v. Badpuppy*

11   *Enter.*, 75 F. Supp. 2d 1104, 1111 (C.D. Cal. 1999).  Moreover, the allegations against them,

12   which concern purchases made by a New York entity from overseas corporations and tax

13   obligations connected to those transactions, do not involve activities "expressly aimed" at

14   California.  *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).  For these reasons,

15   it is statutorily and constitutionally impermissible for this Court to exercise personal jurisdiction

16   over Mr. Yung or Mr. Courbanou.

17   **IV.    CONCLUSION**

18            Plaintiff's revised Cartwright Act and UCL claims are every bit as deficient as its

19   first.  The failure of Plaintiff's re-pleaded claims establishes that the deficiencies in its claims

20   cannot be cured with further pleading.  Defendants respectfully submit that Plaintiff's Cartwright

21

---

22   [14] Plaintiff tersely alleges that Messrs. Yung and Courbanou "communicate and interact with
     California merchants, employees and salespeople on a routine or semi-routine basis, and
23   intentionally engage in wrongful conduct knowing that such conduct will affect the California
     market."  These allegations are inadequate to establish general or specific jurisdiction over
24   Messrs. Yung and Courbanou.  Moreover, plaintiffs cannot establish personal jurisdiction by
     relying on bare allegations that contradict specific denials made by defendants.  *Pebble Beach Co.*
25   *v. Caddy*, 453 F.3d 1151, 1160 (9th Cir. 2006)

26   [15] The fact that Kam Hing and Sunham have not challenged personal jurisdiction is immaterial to
     whether Messrs. Yung and Courbanou are themselves subject to local jurisdiction: "Each
27   defendant's contacts with the forum State must be assessed individually."  *Calder v. Jones*, 465
     U.S. 783, 790 (1984); *see also Davis v. Metro Prods., Inc.*, 885 F.2d 515, 521 (9th Cir. 1989) (the
28   mere fact that a corporation is subject to local jurisdiction does not necessarily mean that its
     nonresident officers and directors are as well).

1  Act and UCL claims, and its FAC, must be dismissed with prejudice.

2

3

4  DATED: June 13, 2008                              Munger, Tolles & Olson LLP
                                                     GARTH T. VINCENT
                                                     AMY C. TOVAR
5

6

7                                                    By:_____/s/_____
                                                              AMY C. TOVAR

8                                                    Attorneys for Defendants
                                                     KAM HING ENTERPRISES, INC.;
9                                                    SUNHAM HOME FASHIONS, LLC;
                                                     HOWARD YUNG; AND ARTHUR
10                                                   COURBANOU

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GARTH T. VINCENT (SBN 146574)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702
Email: *garth.vincent@mto.com*

AMY TOVAR (SBN 230370)
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, CA  94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077
Email: *amy.tovar@mto.com*

Attorneys for Defendants
KAM HING ENTERPRISES, INC.; SUNHAM HOME
FASHIONS, LLC; HOWARD YUNG; and ARTHUR
COURBANOU

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| E&E CO., LTD., A California corporation,<br><br>                    Plaintiff,<br><br>          vs.<br><br>KAM HING ENTERPRISES, INC.;<br>SUNHAM HOME FASHIONS, LLC; JJ<br>INTERNATIONAL TRADING<br>COMPANY; HOWARD YUNG,<br>ARTHUR COURBANOU; and DOES 1-<br>100, inclusive,<br><br>                    Defendants. | CASE NO.  3:08-CV-00871-MMC<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>DATE:     July 25, 2008<br><br>TIME:     9:00 a.m.<br><br>CTRM:     7, 19th Floor |

1

**REQUEST FOR JUDICIAL NOTICE**

2

Under well-established law, "facts subject to judicial notice may be considered on

3

a motion to dismiss" without converting the motion into one for summary judgment. *Intri-Plex*

4

*Technologies, Inc. v. Crest Group, Inc.,* 499 F.3d 1048, 1052 (9th Cir. 2007); *Mullis v. United*

5

*States Bankruptcy Court,* 828 F.2d 1385, 1388 (9th Cir. 1987). Under equally well-established

6

law, a "court [reviewing a motion to dismiss] need not accept as true . . .allegations that contradict

7

facts that may be judicially noticed." *Schwarz v. United States,* 234 F.3d 428, 435 (9th Cir.

8

2000). Defendants Kam Hing Enterprises, Inc., Sunham Home Fashions, LLC, Howard Yung,

9

and Arthur Courbanou respectfully request that the Court take judicial notice of the matters set

10

forth below. These matters are subject to mandatory judicial notice under Federal Rule of

11

Evidence 201 as a fact that is "not subject to reasonable dispute in that it is . . . capable of

12

accurate and ready determination by resort to sources whose accuracy cannot reasonably be

13

questioned." Fed. R. Evid. 201(b).

14

Defendants respectfully request judicial notice of the publicly available document

15

titled "2007 Major Shippers Report: Total Non-Apparel Imports" published by the United States

16

Department of Commerce, International Trade Administration, Office of Textiles and Apparel.

17

Judicial notice of this documents is proper because "a court may take judicial notice of "records

18

and reports of administrative bodies." *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279,

19

1282 (9th Cir. 1986) (citing *Interstate Natural Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th

20

Cir. 1953)); *see also* Schwarzer, Tashima, Wagstaffe, Cal. Prac. Guide Fed. Civ. Proc. Before

21

Trial Ch. 9-D at 9:219 (Rutter Group 2007).

22

A copy of the report, category 362: Cotton Bedspreads/Quilts is attached hereto as

23

Exhibit A and available online at http://otexa.ita.doc.gov/msr/catV362.htm.

24

A copy of the report, category 361: Cotton Sheets is attached hereto as Exhibit B

25

and available online at http://otexa.ita.doc.gov/msr/catV361.htm.

26

A copy of the report, category 360: Cotton Pillowcases is attached hereto as

27

Exhibit C and available online at http://otexa.ita.doc.gov/msr/catV360.htm.

28

The report is accessible through the United States Department of Commerce

1    Office of Textiles and Apparel's website located at http://otexa.ita.doc.gov/msrpoint.htm.  A

2    printout of the website's homepage is attached hereto as Exhibit D.  From that page, clicking the

3    link titled "U.S. Imports by Category" brings the viewer to a page titled "Major Shippers Report:

4    Section One, Textiles and Apparel Imports By Category."  This page is located at

5    http://otexa.ita.doc.gov/MSRcat.htm. A printout of that page is attached hereto as Exhibit E.

6    From that page, clicking the link titled "362: Cotton Bedspreads/Quilts)" brings the viewer to

7    Exhibit A; clicking the link titled "361: Cotton Sheets" brings the viewer to Exhibit B; and

8    clicking the link titled "360: Cotton Pillowcases" brings the viewer to Exhibit C.

9               From this judicially noticeable report, Defendants respectfully request that the

10   Court take notice of the following facts in particular:

11               1.       In 2007, over $1 billion worth of cotton bedspreads/quilts were imported

12   into the United States.  *See* Exhibit A (row titled "World," column titled "2007").

13               2.       In 2007, over $500 million worth of cotton bedspreads/quilts were

14   imported into the United States from China.  *See* Exhibit A (row titled "China," column titled

15   "2007").

16               3.       In 2007, nearly $500 million worth of cotton bedspreads/quilts were

17   imported into the United States from countries other than China.  *See* Exhibit A (compare row

18   titled "World" with row titled "China," column titled "2007").

19               4.       In 2007, over $1.5 billion worth of cotton sheets were imported into the

20   United States.  *See* Exhibit B (row titled "World," column titled "2007").

21               5.       In 2007, nearly $400 million worth of cotton pillowcases were imported

22   into the United States.  *See* Exhibit C (row titled "World," column titled "2007").

23               6.       China is the single largest exporter of cotton bedspreads, sheets, and

24   pillowcases to the United States, exporting over $1 billion worth of such items into the United

25   States in 2007.  *See* Exhibits A-C (rows titled "China," columns titled "2007").

26               7.       In 2007, more than $3 billion worth of cotton bedspreads, sheets, and

27   pillowcases were imported into the United States.  *See* Exhibits A-C (rows titled "World,"

28   columns titled "2007").

1    Dated: June 13, 2008                          Munger, Tolles & Olson LLP
                                                    GARTH T. VINCENT
2                                                   AMY TOVAR

3

4                                                   By:_____/s/_____
                                                              AMY TOVAR
5

6                                                   Attorneys for Defendants
                                                    KAM HING ENTERPRISES, INC.;
7                                                   SUNHAM HOME FASHIONS, LLC;
                                                    HOWARD YUNG; and ARTHUR
8                                                   COURBANOU

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5281852.1                         - 4 -         REQUEST FOR JUDICIAL NOTICE
                                                CASE NO. 3:08-CV-00871-MMC

# EXHIBIT A

Major Shippers Category 362

Page 1 of 2

June 5, 2008

MAJOR SHIPPERS REPORT
By Category, 4/2008 Data

Category 362: COTTON BEDSPREADS / QUILTS   * I/P: *
Data in Million $$$,

| Country | Calendar Years 2006 | 2007 | Year-to-Date 4/2007 | 4/2008 | % Change | Year-Endings 4/2007 | 2/2008 | 3/2008 | 4/2008 | YE 4/2008 % Change | % Share |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WORLD | 922.614 | 1004.647 | 295.930 | 330.424 | 11.66 | 944.520 | 1030.818 | 1029.536 | 1039.141 | 10.02 | 100.00 |
| CHINA P | 488.115 | 562.095 | 151.923 | 187.439 | 23.38 | 499.904 | 587.005 | 588.080 | 597.611 | 19.55 | 57.51 |
| PAKISTN | 189.679 | 182.489 | 56.887 | 62.437 | 9.76 | 186.714 | 186.910 | 188.788 | 188.039 | 0.71 | 18.10 |
| INDIA | 85.971 | 70.984 | 23.175 | 25.449 | 9.81 | 82.291 | 73.361 | 72.109 | 73.258 | -10.98 | 7.05 |
| MEXICO | 17.956 | 54.879 | 13.791 | 22.799 | 65.32 | 26.860 | 58.958 | 60.294 | 63.887 | 137.85 | 6.15 |
| PORTUGL | 37.435 | 35.875 | 11.844 | 8.139 | -31.29 | 36.778 | 33.924 | 32.966 | 32.169 | -12.53 | 3.10 |
| ITALY | 25.236 | 22.551 | 8.136 | 7.319 | -10.04 | 25.305 | 21.569 | 22.008 | 21.734 | -14.11 | 2.09 |
| ISRAEL | 11.861 | 10.121 | 3.827 | 4.893 | 27.84 | 11.585 | 10.891 | 11.206 | 11.187 | -3.43 | 1.08 |
| TURKEY | 13.019 | 12.549 | 3.949 | 1.467 | -62.84 | 12.191 | 10.826 | 10.535 | 10.067 | -17.43 | 0.97 |
| BAHRAIN | 0.753 | 5.264 | 2.380 | 2.126 | -10.67 | 3.132 | 5.676 | 5.302 | 5.010 | 59.94 | 0.48 |
| PHIL R | 5.100 | 4.574 | 1.627 | 1.727 | 6.21 | 4.867 | 4.665 | 4.636 | 4.675 | -3.95 | 0.45 |
| SPAIN | 3.456 | 5.724 | 2.021 | 0.941 | -53.46 | 5.180 | 5.596 | 5.075 | 4.643 | -10.35 | 0.45 |
| CANADA | 6.716 | 5.707 | 2.254 | 1.083 | -51.97 | 7.787 | 5.201 | 4.838 | 4.536 | -41.75 | 0.44 |
| GERMANY | 4.706 | 5.986 | 2.863 | 0.346 | -87.91 | 6.908 | 4.435 | 3.695 | 3.470 | -49.78 | 0.33 |
| BNGLDSH | 4.047 | 3.462 | 1.151 | 0.741 | -35.66 | 4.215 | 3.177 | 3.137 | 3.052 | -27.59 | 0.29 |
| EGYPT | 3.182 | 2.693 | 1.976 | 0.503 | -74.56 | 4.538 | 1.724 | 1.380 | 1.219 | -73.13 | 0.12 |

Case 3:08-cv-00871-MMC   Document 27-2   Filed 06/13/2008   Page 7 of 27

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| THAILND | 1.614 | 1.383 | 0.531 | 0.267 | -49.77 | 1.598 | 1.200 | 1.136 | 1.118 | -30.05 | 0.11 |
| DENMARK | 9.794 | 4.509 | 3.658 | 0.018 | -99.51 | 11.547 | 2.957 | 0.868 | 1.616 | -92.48 | 0.08 |
| CAMBOD | 1.040 | 0.649 | 0.293 | 0.303 | 3.63 | 0.819 | 0.609 | 0.662 | 0.660 | -19.41 | 0.06 |
| VIETNAM | 0.284 | 0.473 | 0.161 | 0.135 | -16.36 | 0.363 | 0.481 | 0.458 | 0.446 | 23.00 | 0.04 |
| SALVADR | 1.356 | 0.108 | 0.043 | 0.009 | -78.26 | 1.072 | 0.096 | 0.090 | 0.075 | -93.03 | 0.01 |
| C,H,K,T | 490.563 | 564.070 | 152.547 | 187.960 | 23.21 | 502.145 | 588.781 | 589.829 | 599.483 | 19.38 | 57.69 |
| OECD | 105.686 | 99.202 | 36.511 | 20.624 | -43.51 | 110.911 | 90.293 | 86.557 | 83.315 | -24.88 | 8.02 |
| EU15 | 83.688 | 78.472 | 29.728 | 17.561 | -40.93 | 88.697 | 71.931 | 68.836 | 68.306 | -25.24 | 6.38 |
| EU12 | 83.556 | 77.817 | 29.637 | 17.378 | -41.36 | 88.519 | 71.207 | 68.105 | 65.558 | -25.94 | 6.31 |
| ASEAN | 8.199 | 7.143 | 2.633 | 2.523 | -4.20 | 7.803 | 7.021 | 6.954 | 7.033 | -9.88 | 0.68 |
| CBI | 1.509 | 0.404 | 0.183 | 0.020 | -88.97 | 1.333 | 0.306 | 0.298 | 0.242 | -81.87 | 0.02 |
| CAFTA | 1.504 | 0.402 | 0.183 | 0.020 | -89.22 | 1.328 | 0.303 | 0.295 | 0.239 | -82.01 | 0.02 |

Go Back To Major Shippers Category Page

Go Back To Trade Data Page

Go Back To OTEXA Home Page

# EXHIBIT B

June 5, 2008

MAJOR SHIPPERS REPORT
By Category, 4/2008 Data

Category 361: COTTON SHEETS
Data in Million $$$, * I/P: *

| Country | Calendar Years 2006 | Calendar Years 2007 | Year-to-Date 4/2007 | Year-to-Date 4/2008 | % Change | Year-Endings 4/2007 | Year-Endings 2/2008 | 3/2008 | 4/2008 | YE 4/2008 % Change | % Share |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WORLD | 1363.310 | 1500.559 | 435.862 | 451.128 | 3.50 | 1413.890 | 1516.483 | 1519.545 | 1515.825 | 7.21 | 100.00 |
| CHINA P | 378.315 | 510.447 | 145.346 | 156.925 | 7.97 | 415.841 | 521.325 | 519.963 | 522.027 | 25.54 | 34.44 |
| PAKISTN | 417.519 | 401.032 | 117.184 | 114.671 | -2.14 | 418.561 | 397.418 | 403.656 | 398.518 | -4.79 | 26.29 |
| INDIA | 224.629 | 264.673 | 91.382 | 112.547 | 23.16 | 246.912 | 280.767 | 283.662 | 285.838 | 15.77 | 18.86 |
| TURKEY | 53.330 | 53.485 | 3.223 | 0.640 | -80.15 | 49.430 | 52.643 | 52.305 | 50.903 | 2.98 | 3.36 |
| BRAZIL | 42.809 | 49.494 | 14.461 | 11.678 | -19.25 | 40.715 | 50.203 | 47.618 | 46.711 | 14.73 | 3.08 |
| PORTUGL | 61.522 | 49.048 | 12.154 | 9.284 | -23.61 | 64.945 | 46.351 | 46.319 | 46.178 | -28.90 | 3.05 |
| BAHRAIN | 15.581 | 29.719 | 8.825 | 11.351 | 28.61 | 19.343 | 30.546 | 32.193 | 32.244 | 66.70 | 2.13 |
| ISRAEL | 43.666 | 32.572 | 12.283 | 5.392 | -56.10 | 29.610 | 29.588 | 26.642 | 25.682 | -35.16 | 1.69 |
| ITALY | 26.050 | 25.987 | 8.637 | 7.057 | -18.30 | 26.110 | 25.334 | 24.801 | 24.407 | -6.52 | 1.61 |
| THAILND | 19.391 | 14.026 | 3.515 | 6.091 | 73.28 | 14.691 | 14.144 | 15.324 | 16.602 | 13.01 | 1.10 |
| EGYPT | 18.296 | 14.121 | 4.061 | 5.737 | 41.24 | 16.346 | 15.077 | 15.525 | 15.796 | -3.36 | 1.04 |
| TURKMEN | 9.689 | 13.473 | 0.001 | 0.000 | -100.00 | 9.624 | 13.473 | 13.473 | 13.472 | 39.99 | 0.89 |
| INDNSIA | 6.588 | 6.755 | 1.699 | 2.160 | 27.12 | 6.095 | 7.025 | 7.125 | 7.216 | 18.39 | 0.48 |
| MEXICO | 15.622 | 9.039 | 3.661 | 1.341 | -63.37 | 14.606 | 7.542 | 7.087 | 6.719 | -54.00 | 0.44 |
| GERMANY | 3.529 | 4.222 | 0.550 | 0.452 | -17.77 | 3.691 | 4.165 | 4.078 | 4.125 | 11.75 | 0.27 |

Case 3:08-cv-00871-MMC   Document 27-2   Filed 06/13/2008   Page 10 of 27

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| PHIL R | 3.851 | 6.189 | 0.807 | -74.90 | 6.433 | 4.894 | 4.403 | 3.779 | -41.25 | -0.25 |
| SPAIN | 8.635 | 3.171 | 1.450 | 0.820 | -43.45 | 2.723 | 2.140 | 2.541 | -60.95 | 0.17 |
| VIETNAM | 0.288 | 1.104 | 0.097 | 1.322 | 1259.44 | 0.354 | 1.983 | 2.066 | 558.07 | 0.15 |
| ARAB EM | 2.477 | 1.736 | 0.529 | 1.001 | 89.48 | 2.921 | 2.307 | 2.394 | -24.40 | 0.15 |
| BNGLDSH | 1.538 | 2.525 | 0.880 | 0.400 | -54.51 | 2.160 | 2.170 | 2.045 | -5.31 | 0.13 |
| CAMBOD | 1.979 | 1.645 | 0.695 | 0.501 | -27.84 | 1.931 | 1.429 | 1.451 | -24.85 | 0.10 |
| TOKELAU | 0.124 | 0.474 | 0.000 | 0.000 | * | 0.124 | 0.474 | 0.474 | 283.75 | 0.03 |
| HG KONG | 3.575 | 0.985 | 0.543 | 0.009 | -98.41 | 2.850 | 0.731 | 0.638 | -84.19 | 0.03 |
| _C,H,K,T | 381.950 | 511.693 | 146.005 | 156.963 | 7.51 | 418.859 | 522.310 | 520.760 | 24.78 | 34.48 |
| OECD | 156.642 | 140.020 | 27.262 | 19.081 | -30.01 | 154.144 | 134.876 | 133.416 | -14.47 | 8.70 |
| EU15 | 102.036 | 85.464 | 23.617 | 18.220 | -22.85 | 103.457 | 81.345 | 80.209 | -22.61 | 5.28 |
| EC12 | 102.027 | 85.429 | 23.608 | 18.195 | -22.93 | 103.440 | 81.310 | 80.157 | -22.65 | 5.28 |
| _ASEAN | 32.099 | 29.743 | 9.224 | 10.939 | 18.59 | 29.505 | 29.501 | 30.392 | 6.62 | 2.08 |
| _HK,K,T | 3.635 | 1.246 | 0.659 | 0.038 | -94.30 | 3.017 | 0.985 | 0.797 | 0.624 | -79.32 | 0.04 |

Go Back To Major Shippers Category Page

Go Back To Trade Data Page

Go Back To OTEXA Home Page

# EXHIBIT C

MAJOR SHIPPERS REPORT
By Category, 4/2008 Data

Category 360: COTTON PILLOWCASES    * I/P: *
Data in Million $$$,

| Country | Calendar Years 2006 | 2007 | Year-to-Date 4/2007 | 4/2008 | % Change | Year-Endings 4/2007 | 2/2008 | 3/2008 | 4/2008 | YE 4/2008 % Change | % Share |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WORLD | 333.140 | 374.224 | 106.768 | 112.499 | 5.37 | 347.229 | 381.279 | 382.166 | 379.955 | 9.42 | 100.00 |
| CHINA P | 93.147 | 128.145 | 36.130 | 38.929 | 7.75 | 104.548 | 131.148 | 131.403 | 130.944 | 25.25 | 34.46 |
| PAKISTN | 99.393 | 98.054 | 27.368 | 25.064 | -8.42 | 97.368 | 97.572 | 97.633 | 95.751 | -1.66 | 25.20 |
| INDIA | 55.634 | 68.836 | 23.283 | 31.992 | 37.40 | 63.358 | 75.571 | 76.988 | 77.545 | 22.39 | 20.41 |
| PORTUGL | 14.940 | 13.381 | 3.439 | 2.102 | -38.87 | 15.945 | 12.302 | 12.197 | 12.045 | -24.46 | 3.17 |
| BRAZIL | 11.863 | 10.875 | 2.756 | 2.941 | 6.73 | 11.313 | 11.036 | 11.061 | 11.061 | 11.11 | 2.91 |
| TURKEY | 11.445 | 11.626 | 1.108 | 0.385 | -65.27 | 11.018 | 11.351 | 11.251 | 10.903 | -1.04 | 2.87 |
| BAHRAIN | 3.828 | 7.698 | 1.533 | 2.404 | 56.82 | 4.805 | 8.204 | 8.488 | 8.570 | 78.34 | 2.26 |
| ITALY | 9.117 | 8.665 | 2.616 | 2.386 | -8.76 | 8.815 | 8.543 | 8.472 | 8.436 | -4.30 | 2.22 |
| ISRAEL | 8.791 | 6.655 | 2.516 | 1.152 | -54.19 | 8.360 | 6.129 | 5.498 | 5.292 | -36.70 | 1.39 |
| EGYPT | 5.917 | 3.665 | 1.298 | 1.288 | -0.80 | 5.229 | 3.687 | 3.661 | 3.655 | -30.11 | 0.96 |
| TURKMEN | 1.239 | 2.664 | 0.015 | 0.000 | -100.00 | 1.213 | 2.649 | 2.649 | 2.649 | 118.40 | 0.70 |
| MEXICO | 3.220 | 3.222 | 1.447 | 0.659 | -54.42 | 3.455 | 2.626 | 2.508 | 2.435 | -29.52 | 0.64 |
| THAILND | 4.098 | 1.637 | 0.537 | 1.204 | 124.36 | 3.073 | 1.515 | 1.841 | 2.304 | -25.00 | 0.61 |
| FRANCE | 1.627 | 2.195 | 0.680 | 0.328 | -51.71 | 1.585 | 1.920 | 1.955 | 1.843 | 16.32 | 0.49 |
| PHIL R | 1.733 | 1.279 | 0.503 | 0.265 | -47.37 | 1.495 | 1.106 | 1.062 | 1.041 | -30.35 | 0.27 |

# Major Shippers Category 360

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GERMANY | 0.594 | 1.068 | 0.176 | 0.100 | -43.08 | 0.711 | 0.983 | 0.992 | | 39.49 | 0.26 |
| ARAB EM | 0.827 | 0.772 | 0.046 | 0.250 | 436.78 | 0.844 | 0.925 | 1.020 | | 15.57 | 0.26 |
| INDNSIA | 1.041 | 0.578 | 0.161 | 0.331 | 104.79 | 0.802 | 0.716 | 0.747 | | -6.83 | 0.20 |
| CAMBOD | 0.986 | 0.905 | 0.421 | 0.195 | -53.74 | 1.040 | 0.734 | 0.678 | | -34.80 | 0.18 |
| BNGLDSH | 0.904 | 0.741 | 0.263 | 0.136 | -48.15 | 0.990 | 0.653 | 0.637 | | -37.94 | 0.16 |
| VIETNAM | 0.329 | 0.122 | 0.026 | 0.191 | 631.74 | 0.344 | 0.251 | 0.259 | | -16.67 | 0.08 |
| HG KONG | 1.044 | 0.348 | 0.171 | 0.001 | -99.27 | 0.992 | 0.266 | 0.224 | | -81.99 | 0.05 |
| SPAIN | 0.609 | 0.212 | 0.080 | 0.021 | -73.51 | 0.504 | 0.188 | 0.162 | | -69.64 | 0.04 |
| ETHIOP | 0.117 | 0.132 | 0.018 | 0.021 | 15.55 | 0.066 | 0.153 | 0.153 | | 103.98 | 0.04 |
| TOKELAU | 0.021 | 0.109 | 0.000 | 0.000 | * | 0.021 | 0.109 | 0.109 | | 427.92 | 0.03 |
| RUSSIA | 0.044 | 0.001 | 0.000 | 0.000 | -100.00 | 0.044 | 0.001 | 0.001 | | -98.74 | 0.00 |
| C,H,K,T | 94.216 | 128.589 | 36.309 | 38.934 | 7.23 | 105.566 | 131.507 | 131.718 | 131.214 | 24.30 | 34.53 |
| OECD | 38.807 | 37.640 | 8.249 | 5.439 | -34.07 | 39.066 | 35.810 | 35.503 | 34.829 | -10.85 | 9.17 |
| EU15 | 26.998 | 25.622 | 7.012 | 4.968 | -29.15 | 27.678 | 24.095 | 23.885 | 23.578 | -14.81 | 6.21 |
| EC12 | 26.981 | 25.578 | 7.010 | 4.950 | -29.38 | 27.660 | 24.048 | 23.824 | 23.519 | -14.97 | 6.19 |
| ASEAN | 8.187 | 4.521 | 1.648 | 2.198 | 33.36 | 6.754 | 4.317 | 4.511 | 5.071 | -24.92 | 1.33 |
| HK,K,T | 1.069 | 0.444 | 0.179 | 0.005 | -97.16 | 1.018 | 0.359 | 0.315 | 0.270 | -73.49 | 0.07 |
| SUB-SAH | 0.134 | 0.149 | 0.022 | 0.026 | 17.00 | 0.082 | 0.171 | 0.171 | 0.152 | 86.62 | 0.04 |

Go Back To Major Shippers Category Page

Go Back To Trade Data Page

http://otexa.ita.doc.gov/msr/catV360.htm

Major Shippers Category 360

Go Back To OTEXA Home Page

# EXHIBIT D

**Office of Textiles and Appare**

Home | About OTEXA | Contact U:

QUICKLINKS

Trade Data
   Textiles and Apparel
   Footwear, Leather &
   Travel Goods

The Textile Correlation

Federal Register Notices

China Textile Safeguard

Vietnam Import Monitoring

Wool and Cotton TRQ

TRQ Status

Free Trade Agreements

Trade Preference
Programs

Commercial Availability
   NAFTA
   CAFTA-DR
   Other FTA
   AGOA/ATPDEA/CBTPA

OTEXA Trade Events

U.S. Suppliers Database

Labeling Requirements

IPR Protection

Used Clothing

Berry Amendment

Legislation

Publications

Archives

References/Resources

# TRADE DATA
## U.S. IMPORTS AND EXPORTS OF TEXTILES AND APPAREL

Questions or Comments

## Special Reports
   Preliminary Import Data
   Vietnam Monitoring Data

## THE MAJOR SHIPPERS REPORT.

This report provides General Import statistics by date of import from the Census Bureau for a variety of recent time periods on countries that exceed certain thresholds. The statistics are also summarized in notional categories and countries for the convenience of CITA Agencies. The status of any controls on these imports is also provided. Data does not include plastic apparel.

   Headnotes to the Major Shippers Report
   U.S. Imports by Category
   U.S. Imports by Country
   U.S. Imports by Part Category
   U.S. Imports by Merged Category
   The Textile Correlation. A Correlation between the Textile Import Category System and the Harmonized Tariff Schedule (HTS). Interactive correlation. Lookup the category for an HTS or download the entire correlation as a spreadsheet.

## Additional Import Data Reports (TQ Data).

These interactive reports show U.S. Textile and Apparel Imports from ALL suppliers by MFA Category and Harmonized Tariff Schedule (HTS) line item.

   Textile and Apparel Import Data in units
   Textile and Apparel Import Data in dollars
   Explanatory Notes

   Current and **Historical (data back to 1989)** U.S. textile and apparel imports by MFA Category and Harmonized Tariff Schedule (HTS) line item. *Also includes the ability to group products or countries (annual only). The data can be viewed in a table or downloaded as an **Excel** spreadsheet.*
     • Annual
     • Monthly

- Explanatory Notes

## Other Reports.

- U.S. Import/Production Report for Textiles and Apparel, data through **Third Quarter 2007**,(.pdf) **(updated May 2008).**
- The Textile Correlation. A Correlation between the Textile Import Category System and the Harmonized Tariff Schedule (HTS).

### The Export Market Report.
U.S. Exports of Textile and Apparel Products in dollars
  - by Group
  - by Country
  - U.S. Exports to the Middle East
  - Fastest Growing Markets
  - Historical data: 1989-2007

- Expanded Export Data. U.S. Exports of Textile and Apparel Products by Schedule B line item in first unit of quantity and in dollars. The data can be viewed in a table or downloaded as an Excel spreadsheet.

### The Textile and Apparel Trade Balance Report.
In March 2007 OTEXA expanded the product coverage for the Trade Balance Report to correspond to the product coverage of textile provisions under Free Trade Agreements. This coverage is different than that of the Major Shippers Report which covers imports of textile and apparel in products that were subject to possible quota restraint by the United States under the MFA (Multi-Fiber Arrangement). OTEXA plans to use this expanded product coverage in additional future reports. Product Coverage.

| Trade Balance Report for Selected Countries 2006-2008 | Trade Balance Report for Free Trade Agreement Countries 2006-2008 |
|---|---|
| <ul><li>Imports</li><li>Exports</li><li>Trade Balance</li><li>Overview</li></ul> | <ul><li>Imports</li><li>Exports</li><li>Trade Balance</li><li>Overview</li></ul> |
| **Trade Balance Report for Selected Countries 2005-2007** | **Trade Balance Report for Free Trade Agreement Countries 2005-2007** |
| <ul><li>Imports</li><li>Exports</li><li>Trade Balance</li><li>Overview</li></ul> | <ul><li>Imports</li><li>Exports</li><li>Trade Balance</li><li>Overview</li></ul> |

| Trade Balance Report for Selected Countries 2004-2006 | Trade Balance Report for Free Trade Agreement Countries 2004-2006 |
|---|---|
| • Imports<br>• Exports<br>• Trade Balance<br>• Overview | • Imports<br>• Exports<br>• Trade Balance<br>• Overview |

- U.S. Possessions Report. Imports from the Northern Marianas, Guam, the U.S. Virgin Islands, and American Somoa
- Summary of 2008 Agreements
- The "imports.otx" file, a monthly analysis of textile and apparel imports.

## Trade Preference Programs.

| Utilization of Certain Tariff Rate Quotas (TRQ) | | | |
|---|---|---|---|
| 2008 | 2007 | 2006 | 2005 |
| 2004 | 2003 | 2002 | 2001 |

| Trade Preference Limits (TPLs) | |
|---|---|
| 2008 | 2007 |

## U.S. Imports under Trade Preference Programs

Data in Category Units
- Category 0: Total Textiles and Apparel
- Category 1: Apparel
- Category 2: Non-Apparel
- Category 31: Cotton Apparel
- Category 41: Wool Apparel
- Category 61: MMF Apparel
- Category 81: Silk and Veg.

Data in Million Dollars
- Category 0: Total Textiles and Apparel
- Category 1: Apparel

Apparel Products

- Category 2: Non-Apparel
- Category 31: Cotton Apparel
- Category 41: Wool Apparel
- Category 61: MMF Apparel
- Category 81: Silk and Veg.
  Apparel Products

## U.S. Imports Under Free Trade Agreements

Data in Million Dollars

Total Textiles and Apparel
Apparel
Yarn
Fabric
Made-ups

Note: this report uses the same product coverage that we use for the Trade Balance Report (above). This coverage corresponds to the product coverage of textile provisions under Free Trade Agreements and is different than that of the Major Shippers Report which covers imports of textile and apparel in products that were subject to possible quota restraint by the United States under the MFA (Multi-Fiber Arrangement). Because we do not have square meter equivalent factors for all of the additional products, the report is provided in U.S. dollars only.

## Footwear, Leather and Travel Goods.

Questions or Comments

Imports
Exports

## Release Schedule for Official U.S. Census Import and Export

## Data

| Statistical Month | Release Date |
|---|---|
| **April 2008** | **06/10/2008** |
| May 2008 | 07/11/2008 |
| June 2008 | 08/12/2008 |
| July 2008 | 09/11/2008 |
| August 2008 | 10/10/2008 |
| September 2008 | 11/13/2008 |
| October 2008 | 12/11/2008 |
| November 2008 | 01/13/2009 |
| December 2008 | 02/11/2009 |

# EXHIBIT E

# MAJOR SHIPPERS REPORT: SECTION ONE

## Textiles and Apparel Imports By Category

U.S. Department of Commerce
International Trade Administration
Office of Textiles and Apparel
Categories numbered in the:

- 200 series are of cotton and/or man-made fiber
- 300 series are of cotton
- 400 series are of wool
- 600 series are of man-made fiber
- 700 series are silk apparel but are not included in the aggregate categories above.
- 800 series are of silk blends or non-cotton vegetable fibers

| NOTIONAL CATEGORIES (Aggregations) | | |
|---|---|---|
| 0 TOTAL TEXTILE AND APPAREL IMPORTS (MFA) | (SME ) | ($ VALUE) |
| 1 TOTAL APPAREL IMPORTS (MFA) | (SME ) | ($ VALUE) |
| 2 TOTAL NON-APPAREL IMPORTS (MFA) | (SME ) | ($ VALUE) |
| 11 TOTAL YARN IMPORTS | (SME ) | ( $VALUE) |
| 12 TOTAL FABRIC IMPORTS | (SME ) | ( $VALUE) |
| 14 TOTAL OTHER MISC. IMPORTS | (SME ) | ( $VALUE) |
| 30 COTTON PRODUCTS | (SME ) | ( $VALUE) |
| 31 COTTON APPAREL PRODUCTS | (SME ) | ( $VALUE) |
| 32 COTTON NON-APPAREL PRODUCTS | (SME ) | ( $VALUE) |
| 40 WOOL PRODUCTS | (SME ) | ( $VALUE) |
| 41 WOOL APPAREL PRODUCTS | (SME ) | ( $VALUE) |
| 42 WOOL NON-APPAREL PRODUCTS | (SME ) | ( $VALUE) |
| 60 MAN-MADE FIBER PRODUCTS | (SME ) | ( $VALUE) |
| 61 MAN-MADE FIBER APPAREL PRODUCTS | (SME ) | ( $VALUE) |
| 62 MAN-MADE FIBER NON-APPAREL | (SME ) | ( $VALUE) |
| 80 SILK AND VEG. PRODUCTS | (SME ) | ( $VALUE) |
| 81 SILK AND VEG. APPAREL | (SME ) | ( $VALUE) |
| 82 SILK / VEG. NON-APPAREL PRODUCTS | (SME ) | ( $VALUE) |
| YARN: | | |
| 200 YARN FOR RETAIL SALE,SEWING THREAD | (Kg. ) | ( $ VALUE) |
| 201 SPECIALTY YARNS | (Kg. ) | ( $ VALUE) |
| 300 CARDED COTTON YARN | (Kg. ) | ( $ VALUE) |
| 301 COMBED COTTON YARN | (Kg. ) | ( $ VALUE) |
| 400 WOOL YARNS | (Kg. ) | ( $ VALUE) |

| | | |
|---|---|---|
| 600 TEXTURED FILAMENT YARN | (Kg. ) | ($ VALUE) |
| 603 YARN>85% ARTIFICIAL STAPLE FIBER | (Kg. ) | ($ VALUE) |
| 604 YARN>85% SYNTHETIC STAPLE FIBER | (Kg. ) | ($ VALUE) |
| 606 NON-TEXTURED FILAMENT YARN | (Kg. ) | ($ VALUE) |
| 607 OTHER STAPLE FIBER YARN | (Kg. ) | ($ VALUE) |
| 800 SILK BLENDS OR NON-CTN VEG FIB YRN | (Kg. ) | ($ VALUE) |
| **FABRIC:** | | |
| 218 FABRICS OF YARNS OF DIFF. COLORS | (M2. ) | ($ VALUE) |
| 219 DUCK FABRIC | (M2. ) | ($ VALUE) |
| 220 FABRIC OF SPECIAL WEAVE | (M2. ) | ($ VALUE) |
| 222 KNIT FABRIC | (Kg. ) | ($ VALUE) |
| 223 NON-WOVEN FABRICS | (Kg. ) | ($ VALUE) |
| 224 PILE / TUFTED FABRICS | (M2. ) | ($ VALUE) |
| 225 BLUE DENIM FABRIC | (M2. ) | ($ VALUE) |
| 226 CHEESECLOTH, BATISTES, LAWNS/VOILE | (M2. ) | ($ VALUE) |
| 227 OXFORD CLOTH | (M2. ) | ($ VALUE) |
| 229 SPECIAL PURPOSE FABRIC | (Kg. ) | ($ VALUE) |
| 313 COTTON SHEETING FABRIC | (M2. ) | ($ VALUE) |
| 314 COTTON POPLIN / BROADCLOTH FAB. | (M2. ) | ($ VALUE) |
| 315 COTTON PRINTCLOTH FABRIC | (M2. ) | ($ VALUE) |
| 317 COTTON TWILL FABRIC | (M2. ) | ($ VALUE) |
| 326 COTTON SATEEN FABRIC | (M2. ) | ($ VALUE) |
| 410 WOOL WOVEN FABRIC | (M2. ) | ($ VALUE) |
| 414 OTHER WOOL FABRICS | (Kg. ) | ($ VALUE) |
| 611 WOVEN FABRIC>85% ARTIF STPLE | (M2. ) | ($ VALUE) |
| 613 MMF SHEETING FABRIC | (M2. ) | ($ VALUE) |
| 614 MMF POPLIN / BROADCLOTH FABRIC | (M2. ) | ($ VALUE) |
| 615 MMF PRINTCLOTH FABRIC | (M2. ) | ($ VALUE) |
| 617 MMF TWILL AND SATEEN FABRIC | (M2. ) | ($ VALUE) |
| 618 WOVEN ARTIFICIAL FILAMENT FAB. | (M2. ) | ($ VALUE) |
| 619 POLYESTER FILAMENT FABRIC, LIGHT-WEIGHT | (M2. ) | ($ VALUE) |
| 620 OTHER SYNTHETIC FILAMENT FABRIC | (M2. ) | ($ VALUE) |
| 621 IMPRESSION FABRIC | (Kg. ) | ($ VALUE) |
| 622 GLASS FIBER FABRIC | (M2. ) | ($ VALUE) |
| 624 WOVEN MMF FABRIC, 15%<WOOL<36% | (M2. ) | ($ VALUE) |
| 625 MMF POPLIN/BROADCLTH STAP/FIL | (M2. ) | ($ VALUE) |
| 626 MMF PRINTCLOTH STAP/FIL | (M2. ) | ($ VALUE) |
| 627 MMF SHEETING STAP/FIL | (M2. ) | ($ VALUE) |

| | | |
|---|---|---|
| 628 MMF TWILLS/SATEENS STAP/FIL | (M2. ) | ($ VALUE) |
| 629 OTHER MMF FABRICS OF STAP/FIL | (M2. ) | ($ VALUE) |
| 810 WOVEN FAB, SILK BLD/N-COT VEG FIB | (M2. ) | ($ VALUE) |
| **APPAREL:** | | |
| 237 PLAYSUITS, SUNSUITS, ETC | (Doz ) | ($ VALUE) |
| 239 BABIES' GARM. / CLOTH. ACCESS. | (Kg. ) | ($ VALUE) |
| 330 COTTON HANDKERCHIEFS | (Doz ) | ($ VALUE) |
| 331 COTTON GLOVES AND MITTENS | (Dpr ) | ($ VALUE) |
| 332 COTTON HOSIERY | (Dpr ) | ($ VALUE) |
| 333 M/B SUIT-TYPE COATS, COTTON | (Doz ) | ($ VALUE) |
| 334 OTHER M/B COATS, COTTON | (Doz ) | ($ VALUE) |
| 335 W/G COTTON COATS | (Doz ) | ($ VALUE) |
| 336 COTTON DRESSES | (Doz ) | ($ VALUE) |
| 338 M/B KNIT SHIRTS, COTTON | (Doz ) | ($ VALUE) |
| 339 W/G KNIT SHIRTS/BLOUSES, COTTON | (Doz ) | ($ VALUE) |
| 340 M/B COTTON SHIRTS, NOT KNIT | (Doz ) | ($ VALUE) |
| 341 W/G COT. SHIRTS/BLOUSES,N-KNIT | (Doz ) | ($ VALUE) |
| 342 COTTON SKIRTS | (Doz ) | ($ VALUE) |
| 345 COTTON SWEATERS | (Doz ) | ($ VALUE) |
| 347 M/B COT. TROUSERS/BREECHES/SHORTS | (Doz ) | ($ VALUE) |
| 348 W/G COTTON TROUSERS/SLACKS/SHORTS | (Doz ) | ($ VALUE) |
| 349 BRASSIERES, OTHER BODY SUPPORT GAR | (Doz ) | ($ VALUE) |
| 350 COTTON DRESSING GOWNS, ROBES ETC. | (Doz ) | ($ VALUE) |
| 351 COTTON NIGHTWEAR/PAJAMAS | (Doz ) | ($ VALUE) |
| 352 COTTON UNDERWEAR | (Doz ) | ($ VALUE) |
| 354 W/G DOWN-FILLED COATS | (Doz ) | ($ VALUE) |
| 359 OTHER COTTON APPAREL | (Kg. ) | ($ VALUE) |
| 431 WOOL GLOVES/MITTENS | (Dpr ) | ($ VALUE) |
| 432 WOOL HOSIERY | (Dpr ) | ($ VALUE) |
| 433 M/B SUIT-TYPE COATS, WOOL | (Doz ) | ($ VALUE) |
| 434 OTHER M/B WOOL COATS | (Doz ) | ($ VALUE) |
| 435 W/G WOOL COATS | (Doz ) | ($ VALUE) |
| 436 WOOL DRESSES | (Doz ) | ($ VALUE) |
| 438 WOOL KNIT SHIRTS/BLOUSES | (Doz ) | ($ VALUE) |
| 439 BABIES' GARMENTS/CLOTHING ACCESS. | (Kg. ) | ($ VALUE) |
| 440 WOOL SHIRTS/BLOUSES, NOT-KNIT | (Doz ) | ($ VALUE) |
| 442 WOOL SKIRTS | (Doz ) | ($ VALUE) |
| 443 M/B SUITS, WOOL | (Nos ) | ($ VALUE) |

| | | |
|---|---|---|
| 444 W/G SUITS, WOOL | (Nos ) | ($ VALUE) |
| 445 M/B SWEATERS, WOOL | (Doz ) | ($ VALUE) |
| 446 W/G SWEATERS, WOOL | (Doz ) | ($ VALUE) |
| 447 M/B WOOL TROUSERS/BREECHES/SHORTS | (Doz ) | ($ VALUE) |
| 448 W/G WOOL SLACKS/BREECHES/SHORTS | (Doz ) | ($ VALUE) |
| 459 OTHER WOOL APPAREL | (Kg. ) | ($ VALUE) |
| 630 MMF HANDKERCHIEFS | (Doz ) | ($ VALUE) |
| 631 MMF GLOVES AND MITTENS | (Dpr ) | ($ VALUE) |
| 632 MMF HOSIERY | (Dpr ) | ($ VALUE) |
| 633 M/B MMF SUIT-TYPE COATS | (Doz ) | ($ VALUE) |
| 634 OTHER M/B MMF COATS | (Doz ) | ($ VALUE) |
| 635 W/G MMF COATS | (Doz ) | ($ VALUE) |
| 636 MMF DRESSES | (Doz ) | ($ VALUE) |
| 638 M/B MMF KNIT SHIRTS | (Doz ) | ($ VALUE) |
| 639 W/G MMF KNIT SHIRTS / BLOUSES | (Doz ) | ($ VALUE) |
| 640 M/B NOT-KNIT MMF SHIRTS | (Doz ) | ($ VALUE) |
| 641 W/G NOT-KNIT MMF SHIRTS / BLOUSES | (Doz ) | ($ VALUE) |
| 642 MMF SKIRTS | (Doz ) | ($ VALUE) |
| 643 M/B MMF SUITS | (Nos ) | ($ VALUE) |
| 644 W/G MMF SUITS | (Nos ) | ($ VALUE) |
| 645 M/B MMF SWEATERS | (Doz ) | ($ VALUE) |
| 646 W/G MMF SWEATERS | (Doz ) | ($ VALUE) |
| 647 M/B MMF TROUSERS/BREECHES/SHORTS | (Doz ) | ($ VALUE) |
| 648 W/G MMF SLACKS/BREECHES/SHORTS | (Doz ) | ($ VALUE) |
| 649 MMF BRAS / OTH BODY SUPPORT GARM | (Doz ) | ($ VALUE) |
| 650 MMF ROBES, DRESSING GOWNS, ETC. | (Doz ) | ($ VALUE) |
| 651 MMF NIGHTWEAR / PAJAMAS | (Doz ) | ($ VALUE) |
| 652 MMF UNDERWEAR | (Doz ) | ($ VALUE) |
| 653 M/B MMF DOWN-FILLED COATS | (Doz ) | ($ VALUE) |
| 654 W/G MMF DOWN-FILLED COATS | (Doz ) | ($ VALUE) |
| 659 OTHER MMF APPAREL | (Kg. ) | ($ VALUE) |
| 733 M/B SUIT-TYPE SILK COATS | (Doz ) | ($ VALUE) |
| 735 W/G SILK COATS | (Doz ) | ($ VALUE) |
| 736 SILK DRESSES | (Doz ) | ($ VALUE) |
| 738 M/B SILK KNIT SHIRTS | (Doz ) | ($ VALUE) |
| 739 W/G SILK KNIT SHIRTS / BLOUSES | (Doz ) | ($ VALUE) |
| 740 M/B NOT-KNIT SILK SHIRTS | (Doz ) | ($ VALUE) |
| 741 W/G NOT-KNIT SILK SHIRTS/BLOUSES | (Doz ) | ($ VALUE) |

| | | |
|---|---|---|
| 742 SILK SKIRTS | (Doz ) | ($ VALUE) |
| 744 W/G SILK SUITS | (Nos ) | ($ VALUE) |
| 745 M/B SILK SWEATERS | (Doz ) | ($ VALUE) |
| 746 W/G SILK SWEATERS | (Doz ) | ($ VALUE) |
| 747 M/B SILK TROUSERS/BREECHES/SHORTS | (Doz ) | ($ VALUE) |
| 748 W/G SILK TROUSERS/BREECHES/SHORTS | (Doz ) | ($ VALUE) |
| 750 SILK ROBES, DRESSING GOWNS, ETC | (Doz ) | ($ VALUE) |
| 751 SILK NIGHTWEAR / PAJAMAS | (Doz ) | ($ VALUE) |
| 752 SILK UNDERWEAR | (Doz ) | ($ VALUE) |
| 758 SILK NECKWEAR | (Kg. ) | ($ VALUE) |
| 759 OTHER SILK APPAREL | (Kg. ) | ($ VALUE) |
| 831 GLOVES / MITTENS, SILK / VEG BLEND | (Dpr ) | ($ VALUE) |
| 832 HOSIERY, SILK / VEG BLENDS | (Dpr ) | ($ VALUE) |
| 833 M/B SUIT-TYPE COATS, SLK / VEG | (Doz ) | ($ VALUE) |
| 834 OTHER M/B COATS, SILK / VEG | (Doz ) | ($ VALUE) |
| 835 W/G COATS, SILK / VEG BLENDS | (Doz ) | ($ VALUE) |
| 836 DRESSES, SILK / VEG BLENDS | (Doz ) | ($ VALUE) |
| 838 KNIT SHIRTS / BLOUSES, SILK / VEG | (Doz ) | ($ VALUE) |
| 839 BABY SILK/VEG GARM / CLOTH ACCESS | (Kg. ) | ($ VALUE) |
| 840 N-KNIT SHIRTS / BLOUSES, SILK/VEG | (Doz ) | ($ VALUE) |
| 842 SKIRTS, SILK / VEG. BLENDS | (Doz ) | ($ VALUE) |
| 843 M/B SUITS, SILK / VEG BLENDS | (Nos ) | ($ VALUE) |
| 844 W/G SUITS, SILK / VEG BLENDS | (Nos ) | ($ VALUE) |
| 845 SWEATERS, OTH NON-COT VEG FIBERS | (Doz ) | ($ VALUE) |
| 846 SWEATERS, SILK BLENDS | (Doz ) | ($ VALUE) |
| 847 TROUSERS/BREECHES/SHORTS, SILK/VEG | (Doz ) | ($ VALUE) |
| 850 ROBES, DRESSING GOWNS, ETC, SILK/V | (Doz ) | ($ VALUE) |
| 851 NIGHTWEAR / PJ'S, SILK / VEG | (Doz ) | ($ VALUE) |
| 852 UNDERWEAR, SILK / VEG BLENDS | (Doz ) | ($ VALUE) |
| 858 NECKWEAR, SILK / VEG BLENDS | (Kg. ) | ($ VALUE) |
| 859 OTHER SILK / NON-COT. VEG APPAREL | (Kg. ) | ($ VALUE) |
| **MADE-UPS:** | | |
| 360 COTTON PILLOWCASES | (Nos ) | ($ VALUE) |
| 361 COTTON SHEETS | (Nos ) | ($ VALUE) |
| 362 COTTON BEDSPREADS / QUILTS | (Nos ) | ($ VALUE) |
| 363 COTTON TERRY / OTHER PILE TOWELS | (Nos ) | ($ VALUE) |
| 369 OTHER COTTON MANUFACTURES | (Kg. ) | ($ VALUE) |
| 464 WOOL BLANKETS | (Kg. ) | ($ VALUE) |

| 465 WOOL FLOOR COVERINGS | (M2.) | ($ VALUE) |
| 469 OTHER WOOL MANUFACTURES | (Kg.) | ($ VALUE) |
| 665 MMF FLOOR COVERINGS | (M2.) | ($ VALUE) |
| 666 OTHER MMF FURNISHINGS | (Kg.) | ($ VALUE) |
| 669 OTHER MMF MANUFACTURES | (Kg.) | ($ VALUE) |
| 670 MMF FLAT GOODS, HANDBAGS, LUGGAGE | (Kg.) | ($ VALUE) |
| 863 TOWELS, SILK / VEG. BLENDS | (Nos) | ($ VALUE) |
| 870 LUGGAGE, SILK / VEG. BLENDS | (Kg.) | ($ VALUE) |
| 871 HANDBAGS / FLATGOODS, SILK / VEG | (Kg.) | ($ VALUE) |
| 899 OTH SILK / VEG BLEND MANUFACTURES | (Kg.) | ($ VALUE) |

Go back to **Trade Data Page**

Go back to **OTEXA Home Page**

1   GARTH T. VINCENT (SBN 146574)
    MUNGER, TOLLES & OLSON LLP
2   355 South Grand Avenue
    Thirty-Fifth Floor
3   Los Angeles, CA  90071-1560
    Telephone:     (213) 683-9100
4   Facsimile:     (213) 687-3702
    Email: *garth.vincent@mto.com*
5
    AMY TOVAR (SBN 230370)
6   MUNGER, TOLLES & OLSON LLP
    560 Mission Street
7   Twenty-Seventh Floor
    San Francisco, CA  94105-2907
8   Telephone:     (415) 512-4000
    Facsimile:     (415) 512-4077
9   Email: *amy.tovar@mto.com*

10  Attorneys for Defendants
    KAM HING ENTERPRISES, INC.; SUNHAM HOME
11  FASHIONS, LLC; HOWARD YUNG; and ARTHUR
    COURBANOU
12
                    UNITED STATES DISTRICT COURT
13
                  NORTHERN DISTRICT OF CALIFORNIA
14
                       SAN FRANCISCO DIVISION
15

16
    E&E CO., LTD., A California corporation,      CASE NO.  3:08-CV-00871-MMC
17
                    Plaintiff,                    **[PROPOSED] ORDER GRANTING**
18                                                **DEFENDANTS' MOTION TO DISMISS**
          vs.                                     **FIRST AMENDED COMPLAINT**
19
    KAM HING ENTERPRISES, INC.;
20  SUNHAM HOME FASHIONS, LLC; JJ
    INTERNATIONAL TRADING
21  COMPANY; HOWARD YUNG,
    ARTHUR COURBANOU; and DOES 1-
22  100, inclusive,

23                  Defendants.

24

25

26

27

28

1    The Motion of Defendants Kam Hing Enterprises, Inc., Sunham Home Fashions,

2  LLC, Howard Yung, and Arthur Courbanou for an Order Dismissing Plaintiff's First Amended

3  Complaint came on for hearing before the Court on July 25, 2008.

4    The Court, having considered all of the pleadings, evidence and argument of

5  counsel submitted in support of and opposition to the Motion, and good cause appearing therefor,

6  hereby ORDERS that:

7    [1]    Defendants' motion to dismiss Plaintiff's First Cause of Action for "Per Se

8  Conspiracy" under California Business & Professions Code §§ 16720 *et seq.* is GRANTED.  The

9  cause of action fails to state a claim upon which the Court may grant Plaintiff relief.  Fed. R. Civ.

10  Proc. 12(b)(6).  Plaintiff failed to plausibly allege a horizontal agreement among the Chinese

11  suppliers that was orchestrated by the Defendants.  "[A] mere allegation that parties entered into

12  an agreement to restrain trade does not suffice to state" an antitrust claim.  *International Norcent*

13  *Technology v. Koninklijke Philips Electronics, N.V.*, 2007 WL 4976364, at *10 (C.D. Cal. Oct.

14  29, 2007).

15    [2]    Defendants' motion to dismiss Plaintiff's Second Cause of Action for

16  "Restraint of Trade" under California Business & Professions Code §§ 16720 *et seq.* is

17  GRANTED.  The cause of action fails to state a claim upon which the Court may grant Plaintiff

18  relief.  Fed. R. Civ. Proc. 12(b)(6).  Plaintiff failed to plausibly allege that the Defendants have

19  market power in the relevant market.  "The need to prove market power is a threshold

20  consideration in an antitrust case and the is the sine qua non of recovery."  *Exxon Corp. v.*

21  *Superior Court*, 51 Cal. App. 4th 1672, 1681 (1997).

22    [3]    Defendants' motion to dismiss Plaintiff's Third Cause of Action for

23  "Unfair Competition" under California Business & Professions Code § 17200 is GRANTED.

24  The cause of action fails to state a claim upon which the Court may grant Plaintiff relief.  Fed. R.

25  Civ. Proc. 12(b)(6).  Plaintiff lacks standing under Cal. Bus. & Prof. Code § 17204.  To have

26  standing a "plaintiff must have [1] spent money, [2] lost money or property, or [3] been denied

27  money to which he or she was *entitled*, due to unfair business practices."  *O'Brien v. Camisasca*

28  *Automotive Mfg.*, *Inc.*, 161 Cal. App. 4th 388, 399 (2008) (emphasis added).  The only injury

[PROPOSED] ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS & STRIKE
CASE NO. 3:08-CV-00871-MMC

1  Plaintiff claims is the hypothetical loss of sales and profits, which fails to satisfy standing

2  requirements.  Moreover, Plaintiff has failed to allege that Defendants acted unfairly by engaging

3  in "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit

4  of one of those laws because its effects are comparable to or the same as a violation of the law, or

5  otherwise significantly threatens or harms competition."  *Cel-Tech Commc'ns, Inc., v. Los*

6  *Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

7          [4]     Defendants' motion to dismiss Plaintiff's First, Second, and Third Causes

8  of Action as to Defendants Howard Yung and Arthur Courbanou pursuant to Federal Rule of

9  Civil Procedure 12(b)(2), on the ground that the Court lacks a proper basis for asserting personal

10 jurisdiction over either individual, is GRANTED.  Plaintiff failed to establish that Defendants

11 Howard Yung and Arthur Courbanou have sufficient "minimum contacts with [California] such

12 that the maintenance of the suit does not offend 'traditional notions of fair play and substantial

13 justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*,

14 311 U.S. 457, 463 (1940)).

15          IT IS SO ORDERED.

16

17 Dated: _____

18

19                                          _____

20                                          UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28

5281953.1                          - 3 -            [PROPOSED] ORDER GRANTING DEFENDANTS'
                                                    MOTION TO DISMISS & STRIKE
                                                    CASE NO. 3:08-CV-00871-MMC